IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Submitted on Briefs August 5, 2008

**STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES**
**v.**
**LINDA ESTES, ALFONZO HOLMES, and KELLY TAYLOR**

**In the Matter of Q.E., D.E., & N.H.**

**Appeal from the Juvenile Court for Haywood County**
**No. 7686     J. Roland Reid, Judge**

_____

**No. W2008-00634-COA-R3-PT - Filed December 30, 2008**

_____

This appeal involves the termination of parental rights. The children were taken into protective custody after the mother was arrested for striking her three-year-old child in the face and fleeing from police. The children were found to be dependent and neglected and placed in foster care. After the children were removed from her care, the mother was repeatedly in and out of jail, with the last incarceration for stabbing her boyfriend in the back with a pair of scissors. When she was not in jail, she was largely unemployed and living with either relatives or a boyfriend. DCS filed a petition for termination of the mother's parental rights on the grounds of abandonment by failure to establish a suitable home, abandonment by an incarcerated parent, substantial non-compliance with the permanency plan, and persistent conditions. After a trial, the trial court terminated the mother's parental rights. The mother appeals, arguing that DCS did not make reasonable efforts at reunification, and that the termination of her parental rights is not in the children's best interest. We affirm, finding that the evidence supports the trial court's holding that DCS's efforts at reunification were reasonable under the circumstances, and that termination of the mother's parental rights is in the best interest of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Bob C. Hooper, Brownsville, Tennessee, for the Respondent/Appellant Linda Estes

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Joshua Davis Baker, Assistant Attorney General, for the Petitioner/Appellee State of Tennessee, Department of Children's Services

**OPINION**

# FACTS AND PROCEDURAL HISTORY

This case involves three children born to Respondent/Appellant Linda Estes ("Mother"). The children are son Q.E. (born 5/17/02), son D.E. (born 4/19/03), and daughter N.H. (born 1/18/06).

On June 22, 2006, the Tennessee Department of Children's Services ("DCS") received a report that Mother had struck three-year-old D.E. in the face. When law enforcement arrived at the scene, Mother fled. The officers gave chase and eventually caught her. The officers then discovered that Mother was wanted for violating probation, and she was arrested. From June 22, 2006 until July 2, 2006, Mother was incarcerated at the Haywood County jail on charges of child abuse. Mother pled guilty to felony child abuse.

At the time of her arrest, Mother was married to the legal father of all three children, Alfonzo Holmes ("Holmes").[1] The record does not indicate whether Mother was living with Holmes at the time of her arrest.

On June 28, 2006, pursuant to a DCS petition, the Haywood County Juvenile Court found probable cause to believe that the children were dependent and neglected and placed temporary custody of them with DCS.[2]

On July 2, 2006, Mother was transferred from the Haywood County jail to the Madison County jail for violation of probation and for writing worthless checks. She remained incarcerated there until January 24, 2007. During Mother's incarceration, on July 14, 2006, a DCS caseworker met with Mother to staff a permanency plan for each of the three children. The original plans had a stated goal of reunification with parents or exit custody to live with relatives. The permanency plans were approved by a court order entered on January 10, 2007.

On January 24, 2007, Mother was transferred from the Madison County jail back to the Haywood County jail for missing a court date. She was released from the Haywood County jail the next day. After she was released from jail, Mother worked as a maid at a motel for about two weeks.

On March 28, 2007, a scheduled meeting took place to discuss the new permanency plans. Mother did not attend this meeting because, on that day, she was arrested for making harassing telephone calls to her boyfriend, Frederick Macklin ("Macklin"). The revised permanency plans had a stated goal of exit custody to live with relatives. Mother remained in jail until March 30, 2007.

On May 3, 2007, the court held a ratification hearing concerning the revised permanency plans and an adjudicatory and dispositional hearing on the dependency and neglect petition. Mother

---

[1] The parental rights of Holmes and Kelly Taylor, the alleged biological father of the youngest child N.H., were terminated in these proceedings. Termination of their rights is not an issue in this appeal.

[2] The petition also alleged that Mother's daughter D.H. (born 4/2/01) was dependent and neglected. D.H., however, was placed in the temporary custody of a relative, not DCS. DCS did not seek to terminate Mother's parental rights as to D.H. in these termination proceedings, and she is not part of this appeal.

was present at the hearing. On May 9, the court entered two orders, the first ratifying the revised permanency plans, and the second adjudicating the children to be dependent and neglected.

The next day, on May 10, 2007, Mother was arrested for stabbing Macklin in the back with a pair of scissors. At the time, Mother was pregnant with Macklin's baby. She remained in jail in Haywood County on charges of aggravated domestic assault until October 9, 2007. After her release from jail, Mother lived with Macklin in Jackson, Madison County, Tennessee. Both remained unemployed.

Meanwhile, on September 20, 2007, while Mother was in jail on the domestic assault charges, DCS filed a petition for termination of her parental rights. The petition alleged the following grounds for termination of Mother's parental rights: abandonment by failure to establish a suitable home, abandonment by incarcerated parent, substantial non-compliance with the permanency plan, and persistent conditions that prevented the children's safe return to Mother's care. The trial on the termination petition was held on January 18, 2008.

The first witness to testify at trial was the county director for the Carl Perkins Center ("Center") for the prevention of child abuse, Linda Burns ("Burns"). Burns testified that she first met Mother in 2001, after Mother gave birth to D.H., an older child now in the care of a relative and not at issue in the termination proceedings. At that time, DCS referred Mother to the Center, and she participated in an individual parenting program from April to December 2001, where she learned basic parenting skills. In 2005, Mother was again referred to the Center, but she did not accept any services at that time. In 2007, Mother was referred to the Center again, this time for group parenting classes. Burns said that Mother attended the classes a few times but did not complete the program, apparently because she was incarcerated again.

The trial court next heard testimony from the children's foster mother ("Foster Mother"). Foster Mother testified that she had been caring for Q.E., D.E., and N.H. since July 1, 2006, shortly after they were taken into protective custody. Foster Mother said that she would like to adopt the children, but at 62 years of age, she thought that she was too old to do so.

Foster Mother testified that all three children were doing well in foster care. Q.E. was receiving speech therapy and had earned academic awards, and N.H. was meeting her developmental milestones. D.E. was in a special education class because he has a learning disability. The learning disability caused D.E. to be disruptive at school. However, after D.E. began taking medication to address his learning disability, he had no further problems.

Foster Mother testified that she was receptive to Mother's visitation and had never denied her visitation. Mother visited with the children a total of four times, with each visit lasting from one to two hours. Mother did not call the children, did not send the children gifts for Christmas or their birthdays, and never provided financial support or support in kind. Mother did, however, write the children a letter during one of her periods of incarceration.

The trial court next heard testimony from the DCS caseworker assigned to the case, Bonnie Elam ("Elam"). Elam testified that when she was first assigned to the case, Mother was in jail, and she met with Mother at the jail to discuss the children's permanency plans. Elam testified that the meeting lasted between three and four hours because they completed the permanency plans for all three children and discussed the criteria for the termination of parental rights. Mother signed the document explaining the criteria for termination. Elam also testified that she explained to Mother that resolving her legal issues, as required in the permanency plan, meant not only serving out her current sentence, but also avoiding additional charges. She said that she offered transportation to Mother.

Elam testified that all Mother had to do to schedule a visit with the children was to call Foster Mother or Elam twenty-four hours in advance. She corroborated Foster Mother's testimony that Mother only visited with the children four times since they were removed from Mother's care. Elam said that she gave Mother her telephone number, and that she maintained the same telephone number during the entire time in which she was working with Mother.

Elam testified that the second permanency plan meeting was held on March 28, 2007. Elam testified that Mother was informed of the meeting well in advance, and was offered a ride to the meeting, but Mother did not attend the meeting because she was in jail. In April, Elam discussed with Mother the new permanency plans and the upcoming foster care review board meeting. Mother, however, did not attend the foster care review board meeting. The review board recommended that the goal of the permanency plans be changed to adoption.

A child family team meeting was held on May 3, 2007, and Mother attended this meeting. Elam testified that, at this meeting, they discussed terminating Mother's parental rights. Mother told those at the meeting that she wanted her children back and would do what was necessary to get them back. However, at the time, Mother had not been attending counseling or parenting classes, did not have a home, and did not have a job.

Elam testified that the original permanency plans dated July 14, 2006 required Mother to resolve her legal issues, acquire appropriate housing and stable employment, receive a clinical assessment, and follow all recommendations. Mother fulfilled none of these requirements. Instead of resolving her legal issues, she incurred additional charges, including phone harassment and aggravated assault. She did not get stable employment or housing, and never received a clinical assessment.

When asked about DCS's efforts to help Mother obtain employment, Elam testified that DCS explained to Mother how to look for a job. Mother told them that she was filling out applications to be a waitress, and DCS told Mother to call them if she needed assistance. Elam discussed Section 8 housing with Mother, to help her obtain suitable housing, but Mother was incarcerated again shortly after the conversation. Mother did not tell Elam of any impediments to her obtaining Section 8 housing. Mother never asked Elam for assistance in finding housing or a job.

Elam testified that she met with Mother once a month while she was incarcerated in Haywood County.[3] However, she met with Mother only twice during the approximately six months in which Mother was incarcerated in Madison County because the Madison County jail did not like for inmates to have visitors unless it was absolutely necessary. Before and during Mother's final incarceration from May 2007 to October 2007, Elam met with Mother on May 3, June 7, July 19, July 27, August 20, and August 28, 2007.

When asked about DCS's efforts to help Mother receive counseling services and a clinical assessment, Elam testified that DCS made an appointment for Mother with Pathways, a mental health center. Mother did not have TennCare, but Elam informed Mother that she could apply for TennCare solely for the purpose of paying for her sessions at Pathways, and told her that all she had to do to get approval was to make a phone call and provide TennCare with her personal information. Elam gave her the telephone number to call. Mother never told Elam prior to Mother's incarceration on May 10, 2007 that she had been unable to contact Pathways, and Mother never requested information about any other agencies that could conduct her assessment or provide counseling.

Elam testified about her difficulties in contacting Mother. Elam testified that, after Mother was released from jail in January 2007, Mother told Elam that she was living with her mother and provided Elam with the telephone number. In March 2007, Mother told Elam that she was living with her sister. After Mother was released from jail in March 2007, Mother told Elam that she had moved back in with her mother.

Elam testified that termination of Mother's parental rights would be in the children's best interest because the children had been in the custody of DCS for approximately a year and a half, and it is easier to find adoptive parents for children when they are young. Elam testified that the children needed stability, D.E. has special needs, and Mother had demonstrated that she could not care for the children.

Mother testified on her own behalf. She testified that Elam did not visit her while she was incarcerated in the Haywood County jail between June 22, 2006 to July 2, 2006. Mother said that Elam visited only once, to staff the permanency plan, while she was incarcerated in Madison County from July 2, 2006 to January 24, 2007. Mother claimed that, after her release from jail in January 2007 until her next incarceration in March 2007, she called Elam "all the time."

Mother said that she worked at a Days Inn for approximately two weeks in March 2007, before she was re-arrested on March 28. Mother denied that DCS ever offered to help her find a job. Mother said that she does not know what a clinical assessment is, does not know where to get one, and maintained that Elam did not explain to her how to get one done. Mother said that she asked Elam about Pathways and the Carl Perkins Center. Mother claimed that she told Elam that she had no transportation, that she asked Elam for transportation, and that transportation was never provided to her.

---

[3]It is unclear from Elam's testimony whether she was referring to Mother's first or last period of incarceration in Haywood County.

In her testimony, Mother was asked about D.E.'s special needs.

Q (by counsel for Mother): Okay. Were you aware of his special needs? Let me make sure I'm talking about the right child. [D.E.]
A: Yes, sir.
Q: Were the kids on TennCare when you had them?
A: Yes, sir.
Q: Okay. Did you ever take [D.E.] to the doctor?
A: What kind of doctor?
Q: Oh, regarding his special needs, you know, his aggressiveness?
A: No, sir.
Q: Okay. Did you know to?
A: Do I what?
Q: Did you know there was possibly a medical –
A: I mean, a lot of kids in my family is like that. So I didn't just think he was real aggressive to me. Didn't seem like nothing was wrong with him to me.
Q: Okay. And you didn't know that there might have been a medical problem and that medicine could have treated that?
A: No, sir.

Mother testified that she was willing to do whatever it took to get her children back.

Despite the fact that she had pled guilty to child abuse and had stipulated to hitting D.E. for purposes of the dependency and neglect proceedings, in the trial court below, Mother denied striking three-year-old D.E. in the face. Mother claimed that she did not fully understand Elam's explanation to her concerning the termination of her parental rights, and only signed the criteria for termination because she was incarcerated, and thought it would be in her children's best interest.

Mother testified that, at one time, she had lived in Section 8 housing, but lost her voucher when she went to jail. She said that she was not allowed to get Section 8 housing again until she paid her outstanding $1,500 utility bill. She did not remember whether she told Elam about the outstanding utility bill or if she ever asked for assistance in paying the bill so that she could obtain housing.

Mother testified about the circumstances that led to her incarceration in May 2007 for aggravated domestic assault. She said that she stabbed Macklin, the father of the unborn baby that she was carrying at the time of trial. She explained that she "stuck him in the back with some scissors." Mother said that, at the time of the trial, she was still involved with Macklin, and indeed had been living with him in Jackson, Tennessee since November 2007. Mother testified that, because Macklin lost his job, he had to make arrangements with his landlord so that he could delay payment of the current month's rent until he received his anticipated tax refund. Although Mother was dating Macklin at the time of trial, she was still married to her husband, Holmes. She did not have the money to get a divorce and claimed that Macklin would help her pay for a divorce, again when he received his anticipated tax refund. Because Mother was living in Jackson and had no

transportation, she had not visited her children in Brownsville since October 2007. She admitted that she had not asked Elam for transportation to visit her children.

Mother testified that she had only a ninth grade education, had no job and no income, and was on food stamps. Mother explained that she had not called the children because she had no phone, and had not sent them a letter because she did not have Foster Mother's address. Mother claimed that she tried to call Elam, but that Elam's telephone was disconnected. Mother said that she was working on getting suitable housing, and anticipated looking for a job again in March 2008, after her baby with Macklin was born.

After the trial, on February 18, 2008, the trial court issued its order, terminating Mother's parental rights. The trial judge reviewed the evidence exhaustively and issued detailed findings of fact and conclusions of law. We will review the trial court's findings and conclusions.

At the outset, the trial court summarized Mother's stints in jail since her children were taken into protective custody. It found that, during the eighteen-month period from the date she was arrested for striking D.E. in the face until the date of the termination trial, Mother spent more than eleven of the eighteen months in jail.

The trial court noted that the children's permanency plans required Mother to (1) resolve her legal issues, (2) upon release from jail, obtain appropriate employment and housing, (3) upon release from jail, visit with the children at least four hours per month, (4) participate in a clinical assessment and get counseling for depression and parenting skills, and (5) maintain contact with DCS. It then reviewed Mother's lack of compliance with any of these requirements.

The trial court noted that a clinical assessment and counseling would have directly addressed the reasons why Mother lost custody of her children. DCS made an appointment for Mother to receive these services, but Mother did not go because she felt that she did not need such assistance. DCS provided Mother with the information to get TennCare to pay for the services by just making a phone call, but Mother failed to do so.

The trial court noted that resolution of Mother's legal problems was necessary for her to parent her children, making the pithy observation that: "She cannot parent from jail." Instead of simply serving her time for past offenses and resolving her legal issues, the trial court found that Mother "chose to incur new charges," resulting in repeated incarcerations.

Likewise, despite the fact that DCS provided her with job counseling, during the eighteen-month period following the removal of the children from her care, Mother worked only two weeks. The remainder of the time, the trial court found, Mother did not work because she was pregnant or because "her conduct placed her back in jail." The trial court found that Mother's failure to work was willful.

The trial court found that Mother "never had a home in which to parent the children." When not in jail, she lived with various relatives, all unsuitable to help raise the children. She "cannot go

back to section 8 housing, because of her misconduct in the past" and did not tell the DCS caseworker about the unpaid "past utility bill that prevented her from reapplying for subsidized housing." As for her living situation at the time of trial, the trial court observed:

> [Mother] lives with a man [Macklin] that she attacked with scissors, in his back, and for which she received a felony conviction. . . . Her rent is past due and she [is] about to have another baby. [Macklin] is not even in the home and he has not been there for 3 weeks, although the rental is in his name.

The trial court found that Mother's failure to visit the children was willful. It observed:

> She chose to move to Jackson, knowing she had no car and no license. She chose not to ask Ms. Elam for help in visiting or transportation. Prior to the filing of the petition, she chose not to visit by willfully conducting herself in such a way that she went to jail and could not visit.

The trial court also found that Elam tried to contact Mother in whatever home she was in, to discuss her case, offer services, and help her reach the goals in the permanency plans, but Mother chose not to stay in contact with DCS.

The trial court made explicit findings on DCS's efforts to assist Mother in meeting the requirements of the children's permanency plans:

> For a period of four (4) months following removal, DCS made reasonable efforts to assist the parent to establish a suitable home for the children, but [Mother] had made no reasonable efforts to provide a suitable home and has demonstrated a lack of concern for the children to such a degree that it appears unlikely that she will be able to provide a suitable home for the children at an early date. Obviously [Mother] was in jail for the months following the removal but at the next opportunity that DCS had to assist her in finding a home, on 1/30/07, when she was released from jail, the efforts were made. [Mother] stayed out of jail for two months before going back 2 months later for two days, and then she was out approximately 6 weeks again before going back. Therefore, when DCS could work with [Mother], they did. Ms. Elam spent a fair amount of time looking for [Mother]. She set up a clinical assessment for her at Pathways that would have provided some insight into the specific programs [Mother] would need to be able to parent her children. Ms. Elam had finds [sic] available to assist with utilities, had she known they were a barrier to subsidized housing. [Mother] had to get a job before she could pay rent so the efforts by Ms. Elam were directed towards assisting her with employment, which [Mother] obtained, before losing it because she was again incarcerated. [Mother] could not stay out of jail long enough to save money to get a home.

Accordingly, the trial court found that Mother's parental rights should be terminated based on the following grounds: failure to substantially comply with the permanency plan,[4] abandonment by failing to establish a suitable home,[5] abandonment by incarcerated parent,[6] and persistent conditions that continued to exist to prevent the children's safe return to Mother's care.[7]

After finding grounds for termination, the trial court then found that termination of Mother's parental rights was in the best interest of the children:

It is clearly in the best interests of the minor children that parental rights of [Mother] be terminated. [Mother] has no home, no job, no income, no transportation and no money. She has no way to get [D.E.] the special help he needs with speech and his behavior. She has shown no interest in fostering a relationship with the children in that she has only seen them approximately 6 hours in 18 months. The baby does not know her at all. [Mother] appears to be headed for eviction at this very time. She is pregnant by [Macklin] but still married to [Holmes] and has no means to get a divorce from him. She has a 9th grade education. She refused to cooperate with services by DCS. She refused to follow the Permanency Plans. She refused to follow the Court Orders. She refused to stay in touch with DCS. She paid nothing for the benefit of the children. She would not even call them. She would not send anything more than 2 letters in 18 months and did not even acknowledge their birthdays. She has made no improvement. In fact, she seems to be getting worse, by getting more criminal charges, getting on probation for more serious crimes, which are now violent, and by moving away from her children without having any transportation. There is no way these children can ever be returned to her care or custody. They need a permanent home. They are still very young. DCS is looking for a permanent home for them.

Mother filed a motion to alter or amend and for additional findings of fact, which was denied by the trial court on March 10, 2008. Mother then filed a timely notice of appeal.

---

[4]T.C.A. § 36-1-113(g)(2) (2005).

[5]T.C.A. §§ 36-1-113(g)(1), -102(1)(A)(ii) (2005).

[6]T.C.A. §§ 36-1-113(g)(1), -102(1)(A)(iv) (2005).

[7]T.C.A. § 36-1-113(g)(3) (2005).

On appeal, Mother raises two issues for our review. First, she argues that the trial court erred in finding that DCS made reasonable efforts to reunify her with her children. Second, she contends that the trial court erred in finding that termination of her parental rights was in the best interest of the children.

We review the trial court's findings of fact *de novo* on the record accompanied by a presumption of correctness, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *see In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). Some of the trial court's factual findings are based on its determinations of the credibility of the witnesses. This Court affords great weight to the trial court's credibility determinations, and it will not reverse such determinations absent clear evidence to the contrary. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995) (citation omitted). We review the trial court's conclusions of law *de novo* without a presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001) (citations omitted).

Because Tennessee Code Annotated § 36-1-113(c)(1) requires a heightened burden of proof in parental termination cases, we must also "determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *In re M.J.B.*, 140 S.W.3d at 654 (citations omitted). Thus, we must "draw a distinction between specific facts and the combined weight of these facts." *Id.* at 654 n.35. The trial court's specific findings of fact are presumed correct, so long as they are supported by a preponderance of the evidence. *Id.* We "must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion." *Id.*

## ANALYSIS

In Tennessee, proceedings on the termination of parental rights are governed by statute. To terminate parental rights, two elements must be proven. First, the existence of at least one of the statutory grounds for termination must be shown. T.C.A. § 36-1-113(c)(1) (2005); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Second, it must be proven that terminating the parental rights of the biological parent is in the child's best interest. T.C.A. § 36-1-113(c)(2) (2005); *In re A.W.*, 114 S.W.3d 541, 545 (Tenn. Ct. App. 2003); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Both elements must be proven by clear and convincing evidence. T.C.A. § 36-1-113(c)(1) (2005); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

In this case, the trial court found that the State had proven by clear and convincing evidence several grounds for the termination of Mother's parental rights. It found: (1) under Tennessee Code Annotated § 36-1-113(g)(2), Mother had not substantially complied with the permanency plan dated

July 14, 2006; (2) under Section 36-1-113(g)(1), abandonment[8] by reason of Mother's failure to establish a suitable home[9] and by reason of Mother's incarceration;[10] and (3) under Section 36-1-113(g)(3), persistent conditions that prevented the children's safe return to Mother's care and custody.

As to all of these grounds for termination, for the court to terminate a parent's parental rights, the court must conclude either that DCS has made reasonable efforts to return the children to the parent's care and custody, or that such efforts would have been futile under the circumstances. *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *12 n.13 (Tenn. Ct. App. June 30, 2005) (citing *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 n.27 (Tenn. Ct. App. Mar. 9, 2004)). In this case, the trial court made an affirmative finding that DCS made reasonable efforts to reunify Mother with her children, and it is this finding that Mother appeals.

There are two relevant time frames in which DCS has an obligation to use reasonable efforts. *In re J.L.E.*, 2005 WL 1541862, at *11. The first is before a child is removed from the parent's home. At this point, DCS generally has a duty to use reasonable efforts to avoid removal. *Id.*; *see* T.C.A. § 37-1-166(a)(1), (g)(2)(A) (2005). The second occurs after removal, when DCS must use reasonable efforts to reunify the parent with the child. *In re J.L.E.*, 2005 WL 1541862, at *11; *see* T.C.A. § 37-1-166(a)(2), (g)(2)(B) (2005).

In this case, the children were removed from Mother's home after she was arrested on child abuse charges for striking D.E. in the face and for violating her probation. In its May 9, 2007 order finding the children to be dependent and neglected, the trial court found that "[i]t [was] contrary to the best interest of the minor [children] to remain in the custody of the parent(s)" and "[b]ecause of the emergency nature of the [children's] condition or other circumstances, the lack of preventive measures was reasonable." Mother did not appeal the order adjudicating the children dependent and neglected, and in fact, stipulated that the children were dependent and neglected. Therefore, DCS's efforts prior to the children's removal are not in dispute in this appeal.

We turn, then, to the issue of whether DCS used reasonable efforts to allow the children to safely return to Mother's care and custody. Reasonable efforts is "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." T.C.A. § 37-1-166(g)(1) (2005). "Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not." *In re C.M.M.*, 2004 WL 438326, at *7 (citing *In re D.D.V.*, No. M2001-02282-COA-R3-JV, 2002 WL 225891, at *8 (Tenn. Ct. App. Feb. 14, 2002)). The Department's efforts, however, need not be "Herculean,"

---

[8]Abandonment is defined in Tennessee Code Annotated § 36-1-102.

[9]Under Tennessee Code Annotated § 36-1-102(1)(A)(ii).

[10]Under Tennessee Code Annotated § 36-1-102(1)(A)(iv).

-11-

and it is important to note that "the remedial responsibility does not rest solely on the Department's shoulders. Parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required them to be separated from their children." *Id.* (citing *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov. 18, 2002)). The State has the burden of proving by clear and convincing evidence that its efforts at reunification were reasonable under all of the circumstances. *Id.* at *8; *see* T.C.A. § 36-1-113(c) (2005).

In this appeal, Mother asserts that DCS did not do enough to help her find a job, did not visit her enough when she was incarcerated, failed to properly serve her with process in the original dependency and neglect petition, and failed to make reasonable efforts to have Mother present in court prior to her release in January 2007. All of these facts considered together, Mother argues, indicate that DCS did not use reasonable efforts to reunify her with her children.

In her brief, Mother points to the following portion of Elam's testimony to support her assertion that the trial court erred in finding that DCS made reasonable efforts to reunify Mother with her children:

> Q (by counsel for Mother): . . . What jobs . . . were you pursuing for her?
> A: She was actually at the time, she told us, looking at restaurants for waitress.
> Q: Okay. I understand what she said she's doing, but what did the Department do? I'm asking, what efforts the Department made to help her with these tasks?
> A: Well, we explained to her how to help her look for a job. But when she was telling us that she was actually looking for something, we told her to call us if she needed us. Because at that time, she was looking into being a waitress and had sent out applications.
> Q: Okay. So if I understand you right, DCS just sat there and said, if you need help call us, but you weren't really proactive as far as helping her find jobs?
> A: She was in the process of looking on her own at the time.
> Q: Okay. So you weren't helping her? You were just there if she were to call?
> A: It's not that we were or were not helping her. Because our responsibility is to allow them to be able to do things for themselves. And when she had told me that she had filled out applications, that's pretty much where you start in looking for a job.
> Q: Right.
> A: So the whole concept then, is after she did the applications, you know, we had told her that day, well, follow-up with them. Call, check on them. So basically, I can't call and check on an application that she sent in.
> Q: But you weren't trying to find any jobs for her?
> A: Because she was looking for her own job. She had done her applications.

Citing this excerpt from Elam's testimony, Mother argues that DCS should have been more proactive in helping her find a job.

Like many parents facing a termination petition, Mother had numerous challenges. She needed to stay out of jail, find suitable housing, visit her children, find employment, and obtain an

-12-

assessment and counseling to obtain insight and skills to overcome her obstacles. All of these challenges were interrelated, and all had to be addressed in order to reunify Mother with her children. The trial court quite properly looked at DCS's *overall* efforts to assist Mother. It found that, when Mother was not in jail, she moved around often and failed to stay in contact with DCS, which resulted in the caseworker spending valuable time looking for Mother and trying to contact her. It found that DCS set Mother up to receive services at Pathways and Mother failed to take advantage of services that would have helped her cope with her problems. DCS made efforts to help Mother obtain subsidized housing, and had no way of knowing what Mother did not tell them, namely, that she was ineligible for subsidized housing because of her past unpaid utility bill. Finally, Mother's repeated stints in jail were a continuing obstacle. The trial court found that DCS provided job counseling to Mother during the intervals in which she was not incarcerated, noting that, "when DCS could work with [Mother], they did." Mother clearly knew how to apply for a job and in fact obtained a job at a motel, before losing it because of another arrest. The trial court found that, when Mother was not incarcerated, she used her pregnancy as an "excuse for not working."

Mother also argues that the DCS caseworker should have visited her more often while she was incarcerated in Madison County. Elam testified that she is supposed to meet with parents once a month, but she only met with Mother twice during the six months in which Mother was incarcerated in Madison County because of limitations placed on her by the Madison County jail personnel. Mother does not explain how this affected her ability to meet the requirements of the children's permanency plans or establish a suitable home or find a job. Therefore, we fail to see how this shows that DCS did not make reasonable efforts at reunification.

Mother next cites her alleged failure to receive proper service of process in the dependency and neglect proceeding and DCS's failure to have her transferred from jail to attend a preliminary hearing in the dependency and neglect proceedings, all as evidence that DCS did not make reasonable efforts at reunification. These are procedural issues that Mother should have raised, if at all, during the dependency and neglect proceedings. Dependency and neglect proceedings are distinct from termination proceedings, *In re L.A.J., III*, No. W2007-00926-COA-R3-PT, 2007 WL 3379785, at *6 (Tenn. Ct. App. Nov. 15, 2007), and any procedural deficiencies during the dependency and neglect proceedings are remedied by termination proceedings that satisfy procedural requirements. *See In re S.Y.*, 121 S.W.3d 358, 366 (Tenn. Ct. App. 2003); *see also In re Hoover-Crawford*, No. M2000-01655-COA-R3-CV, 2001 WL 846044, at *4–5 (Tenn. Ct. App. July 27, 2001); *State v. Wilkerson*, No. 03A01-9810-JV-00341, 1999 WL 775759, at *2 (Tenn. Ct. App. Sept. 15, 1999). Mother does not argue that her procedural due process rights were violated during the termination proceedings. We, therefore, do not consider these allegations as undermining the trial court's findings that DCS used reasonable efforts at reunification.

From our careful review of the overall record, we find that it supports, by clear and convincing evidence, the trial court's finding that DCS made reasonable efforts to provide Mother with the support and services she needed to eventually be reunited with her children.

We next address Mother's argument that the trial court erred in finding that terminating Mother's parental rights was in the children's best interest. In making its best interest determination, the court should consider the following non-exclusive list of factors:

-13-

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i) (2005). The determination of best interest should be considered from the perspective of the children, not the parent. *In re Giorgianna H.*, 205 S.W.3d 508, 523 (Tenn. Ct. App. 2006) (citations omitted).

Mother argues that terminating her parental rights is not in the children's best interest. She argues that she has a meaningful relationship with her children, as evidenced by Foster Mother's testimony that the two older children are glad to see Mother when she visits, and by Elam's testimony that the children ask about Mother. Mother also argues that terminating her parental rights will have the effect of further removing the children from their siblings, as to whom Mother has retained her parental rights, even if they are in the care of family members. In support of this position, Mother cites Elam's testimony that if a local adoption is not possible, DCS will conduct a national search for an adoptive family.

At the time that these children were taken into protective custody, they were four years old, three years old, and six months old. Although the trial court found that the youngest did not know Mother at all, it made no specific finding as to whether Mother had a meaningful relationship with the older children or whether termination would further remove the children from their other siblings. The trial court was not required to find the existence of each factor in order to determine that terminating Mother's parental rights was in the best interest of her children. *In re M.A.R.*, 183

S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citing *State v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002)).

Assuming that Mother in fact retained a meaningful relationship with the two older children after they were taken into protective custody, we find that the trial judge appropriately looked at the overall circumstances in making his best interest determination. As noted by the trial court, rather than viewing the removal of the children as a wake-up call that demanded constructive action, Mother put little or no effort into improving her circumstances and in fact ended up in a worsened situation. By the time of trial, the trial court observed, Mother had "no home, no job, no income, no transportation and no money." It observed that the criminal charges against her were becoming more frequent and more serious, even for violent crime, and concluded that there was "no way" that the children could ever be returned to her care.

We agree. Being tethered to a parent who cannot or will not care for them only ensures that these children will spend the entirety of their childhood languishing in foster care, with no permanent home. Terminating Mother's parental rights is their only hope of ever attaining a permanent home with an adoptive parent who can take care of them. We believe that the record supports, by clear and convincing evidence, the trial court's finding that termination is in the children's best interest.

The decision of the trial court is affirmed. The costs of this appeal are taxed to the Appellant, Linda Estes, and her surety, for which execution may issue if necessary.

 

 

_____
HOLLY M. KIRBY, JUDGE