# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### December 15, 2015 Session

## IN RE RILEY C.

### Appeal from the Juvenile Court for Rutherford County
#### No. TC2208T     Donna Scott Davenport, Judge

---

### No. M2015-00541-COA-R3-PT – Filed February 12, 2016

---

This appeal arises from the termination of Father's parental rights. The minor child was removed from his parents, placed in state custody, and adjudicated dependent and neglected after the Tennessee Department of Children's Services ("DCS") received a referral alleging that Father and the child's mother were using and possibly manufacturing methamphetamines in the home. Thereafter, DCS developed permanency plans with the goal of reuniting the family. The mother died shortly thereafter of a drug overdose. DCS subsequently filed a petition to terminate Father's parental rights alleging that Father failed to comply with most of the permanency plan's requirements, that he failed numerous drug screens, failed to provide a suitable home. It also alleged that the abandoned the child by only visiting the child three times and merely providing token support for the child after she was taken into state custody. The trial court terminated Father's parental rights finding that DCS has proven the grounds of substantial noncompliance with a permanency plan and abandonment, and that termination of his parental rights was in the child's best interests. Father appeals. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Brandon M. Booten, Murfreesboro, Tennessee, for the appellant, Michael C.[1]

Herbert H. Slatery, III, Attorney General and Reporter; Eugenia Izmaylova, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

**OPINION**

On March 15, 2013, the Tennessee Department of Children's Services ("DCS") received a referral alleging that Michael C. ("Father") and Wendy C. ("Mother")[2], the parents of the minor child at issue, were using and possibly manufacturing methamphetamine in their home. An employee from Child Protective Services investigated this allegation accompanied by meth task force police officers. Although Father refused to allow a search of the home, both parents agreed to a drug screen and tested positive for methamphetamines, amphetamines, opiates, and marijuana. The parents subsequently admitted that they used methamphetamine for several months and that their then roommate may have manufactured the drug in their garage.

The child was placed with her paternal grandparents pursuant to an Immediate Protection Agreement between the parents and DCS. Shortly thereafter, the parents removed the child from the grandparent's home in violation of the agreement. Upon learning of this violation, DCS placed the child in foster care on March 21, 2013, where the child remains. The child was adjudicated dependent and neglected on May 8, 2013.

On April 10, 2013, DCS developed a permanency plan with the goal of reuniting the family.[3] This plan required Father to cooperate with DCS, have no illegal substances in the home, provide proof of legal income, provide proof of stable housing, complete a budget, not incur any new criminal charges, participate in psychological assessment, attend counseling for drug and alcohol abuse, submit to random drug screens and hair follicle tests, and provide medications for a pill count at all drug screens. Father was also required to demonstrate appropriate parenting skills during his visits with the child, not say anything negative to the child about anyone involved with her, and not make false promises or question the child about the case.

In an effort to assist Father in complying with the permanency plans, DCS arranged and paid for psychological assessments, provided supervised visitation, facilitated random drug screens and pill counts, and provided Father with community resources for how he could receive low cost counseling. DCS also attempted to assist Father in filling out requested budgeting forms and to obtain verification of income and stable housing. Despite these efforts, Father failed to satisfy several of the permanency plan requirements.

---

[2] Because Mother died in January 2014, we shall not address her duties under the parenting plans.

[3] Revised permanency plans were created in August and October of 2013 with similar requirements to the April 10 plan. The later permanency plans added the goal of adoption.

Between March and June 2013, Father had fourteen positive drug screens.[4] Father also had several subsequent criminal convictions, including a conviction for aggravated assault against Mother.[5] Further, Father had multiple addresses during this time and was unable to provide DCS with proof of stable housing while the child was in state custody; as a result, DCS was unable to perform a home visit for Father. Father was unable to provide DCS with proof of legal income or a budget. Father did successfully participate in a psychological evaluation; however, he failed to follow the recommendations of the psychologist such as attending Alcoholics Anonymous or Narcotics Anonymous meetings or anger management classes.

Beginning April 1, 2013, Father was ordered to pay $25 per month for child support; however, Father made only three payments for a total of $100. Additionally, from March to June 2013, Father visited his child only three times.[6] Thereafter, in July 2013, the juvenile court suspended Father's visitation with the child due to his positive drug screens, which the court found posed a threat to the child, his inability to cooperate with DCS, and threats made to DCS caseworkers.[7] However, because Father failed to attend this hearing, the juvenile court expressly stated from the bench that the no-contact order could be lifted upon Father presenting himself in court at a subsequent hearing; however, Father made no attempts to do so until after Mother passed away from an apparent drug overdose in January 2014.

After Mother passed away, Father filed a motion to restore visitation with the child and this motion was granted following a hearing in April 2014. The court ordered that Father was permitted to resume contact with the child at the discretion of the child's therapist. The therapist recommended that Father begin communication with the child through letters, and Father sent the child three letters. The DCS caseworker scheduled several Child and Family Team Meetings with Father, with the purpose of discussing in-

---

[4] These positive drug screens include occasions when Father was called to report for testing but failed to appear. Other positive screens include positive tests for opioids where Father claimed to be on medication but would not provide the pills for pill counts.

[5] In August 2013, Father was convicted of aggravated assault against Mother and was sentenced to three years' probation. Several weeks later Father was arrested for, and pled no contest to, violating an order of protection against Mother. In June 2014, Father was arrested for driving under the influence, although the charge was subsequently reduced to reckless driving. As a result of the reckless driving conviction, Father was incarcerated on September 23, 2014, for violating his probation.

[6] Father was prevented from contacting the child thereafter by court order due to failed drug tests and threats against DCS workers.

[7] Father made statements to DCS workers indicating that he had "knowledge of murders and other meth labs."

person visitation between Father and the child; however, Father failed to attend these meetings and did not respond to attempts by the caseworker to reschedule.

On April 8, 2014, DCS petitioned to terminate Father's parental rights based on substantial non-compliance with the permanency plan, abandonment, and persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(1)-(3).

The petition was tried on October 21 and November 18, 2014, and the juvenile court entered an order on February 20, 2015, terminating Father's parental rights. The juvenile court found that DCS proved grounds for termination based on substantial noncompliance with the permanency plan due to Father's failure to cooperate with DCS, inability to establish any stable residence, failure to refrain from arrests and convictions, and failure of several drug tests. The juvenile court also found sufficient grounds for abandonment based on: (1) Father's willful failure to provide financial support for the child since June 25, 2013, despite being gainfully employed; (2) Father's willful failure to visit the child during the four months preceding the filing of the petition for termination; and (3) Father's failure to provide the child with a suitable home.[8] The juvenile court also found that termination of parental rights was in the best interest of the child.

On appeal, Father contends DCS failed to establish any ground for terminating his parental rights or that termination of his parental rights is in the best interest of his child.

### STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute; the state may terminate a person's parental rights under certain circumstances. *In re Heaven L.F.*, 311 S.W.3d 435, 438 (Tenn. Ct. App. 2010); *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). When a trial court has made findings of fact, we review the findings de novo on the record with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *In re Adoption of Angela E.*, 402 S.W.3d at 639 (citing *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn.

---

[8] The court found that DCS failed to prove the ground of persistence of conditions.

2013)). We next review the trial court's order de novo to determine whether the facts amount to clear and convincing evidence that one of the statutory grounds for termination exists and if so whether the termination of parental rights is in the best interests of the children. *Id.* Clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* (citing *In re Valentine*, 79 S.W.3d at 546 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn.1992)) (internal quotation marks omitted).

## ANALYSIS

### I. GROUNDS FOR TERMINATION

In this case, the juvenile court found that DCS provided sufficient evidence to terminate Father's parental rights on the following grounds: substantial non-compliance with a permanency plan; and abandonment by failure to support, failure to visit, and failure to provide a suitable home. Father challenges the trial court's conclusions with respect to each ground.

### A. Substantial Non-Compliance with the Permanency Plan

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *7 (Tenn. Ct. App. July 31, 2015). A court may terminate parental rights when a parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Under this ground, DCS must first demonstrate that the requirements of a permanency plan are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (citing Tenn. Code Ann. § 37-2-403(a)(2)(C)); *see also In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. DCS must then demonstrate that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 548-49). Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *Id.*

In this case, several permanency plans were developed while the child was in custody, but the requirements of these plans remained the same. The plans required Father to have no illegal substances in the home; not use his home to store or manufacture methamphetamines; provide proof of a legal income; complete a budget; provide proof of stable housing; not incur any new criminal charges; participate in a

psychological assessment with alcohol, drug, and anger management components; provide medications for pill counts during all drug screens; and submit to random drug screens.

Here, the child's removal from Father's custody was necessitated by the unsafe living conditions and illicit drugs to which the child was exposed. The requirements placed on Father in the various permanency plans were directed toward remedying these conditions and had the ultimate purpose of returning the child to a safe and nurturing environment. We conclude that these requirements were reasonable and appropriate. Thus, we will now consider whether Father was in substantial noncompliance with these requirements.

One of the critical goals of the permanency plans was for Father to resolve his drug abuse. However, during the time the child was in state custody, Father had fourteen positive drug screens, failed to submit to several random drug screenings, and did not provide medications for pill counts during all drug screens. Further, Father did not attend Alcoholics Anonymous or Narcotics Anonymous meetings as recommended by his psychological assessment and failed to participate in a psychological assessment with an alcohol, drug, and anger management component.

Additionally, Father failed to complete many of the other requirements designed to guarantee a safe living environment for the child. Father failed to provide DCS with proof of legal income, did not complete a budget, and did not provide proof of stable housing. Father also incurred new criminal charges and has been incarcerated for extended periods throughout this case.

Moreover, rather than working on completing his permanency plan, the record shows that Father voluntarily removed himself from the case in June 2013 and did not make any attempt to complete the permanency plan or visit his child until after his wife died in January 2014. Even after Father expressed his desire to continue his efforts to complete the requirements of the permanency plan, his participation in Child and Family Team Meetings was inconsistent and sporadic.

Based on the foregoing and other evidence in the record, we affirm the juvenile court's conclusion that DCS proved the ground of substantial noncompliance with the permanency plan under Tenn. Code Ann. § 36-1-113(g)(2) by clear and convincing evidence.

Although a court may terminate parental rights if only one statutory ground is proven and it is determined that termination of the parent's rights is in the best interest of the child, Tenn. Code Ann. § 36-1-113(c), we are to consider each ground found by the trial court. *See In re Carrington H.*, No. M2014-00453-SC-R11-PT, 2016 WL 363993, __

S.W.3d __ (Tenn. Jan. 29, 2016). Accordingly, we will examine the other grounds found by the juvenile court.

## B. Abandonment by Failure to Support

Tenn. Code Ann. § 36-1-113(g) provides that a parent's rights may be terminated when he abandons his child. For the purposes of terminating parental rights, "abandonment" may be established by showing that:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i); *In re D.L.B.*, 118 S.W.3d 360, 365 (Tenn. 2003).

To find that a parent has abandoned his children by failing to support them financially, it must be established that the failure to support was "willful." *In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008). Failure to pay support is "willful" if the parent is "aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In re J.J.C.*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004) (quoting *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003)). A parent cannot be said to have abandoned a child when his failure to support is due to circumstances outside of his control. *Id.* A parent may not attempt to rectify abandonment by resuming payments of support subsequent to the filing of any petition seeking to terminate parental rights or seeking to adopt a child. *Id.* (citing Tenn. Code Ann. § 36-1-102(1)(F)).

In this case, the petition to terminate Father's parental rights was filed on April 8, 2014. Thus, the relevant statutory period is December 7, 2013, through April 7, 2014. The record does not indicate that Father was incarcerated, hospitalized, or incapacitated in any way during this period.[9]

_____

[9] If a parent is incarcerated when a termination action is commenced or if a parent is incarcerated during the four month period preceding such commencement, the court, in considering abandonment, must look to the parent's visitation and support during the four month period *preceding incarceration* rather than to the four month period preceding the petition. Tenn. Code Ann. § 36-1-102(1)(A)(iv); *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021617, at *9 (Tenn. Ct. App. April 29. 2005). In this case, Father had several criminal convictions; however, he was only incarcerated twice. Father testified that his first incarceration began August 17, 2013, as a result of his

(continued…)

It is undisputed that Father did not pay any child support or provide his child with any other necessities during the relevant four-month period. The record indicates that since the child has been in state custody, Father has made only three support payments totaling one hundred dollars, and these payments took place in May, June, and July of 2013, before the statutory period began. Father contends, however, that his failure to pay support was not willful because DCS has not met its burden of showing that Father had the means to provide the child with support.

At trial, Father testified regarding his income and expenses during this period. Father testified that for twenty-four years he and the child's mother ran their own business, but stopped operations in August 2013. He stated that the child's mother kept the books. Father was unable to state exactly how much income was generated from this business and did not know what his tax return was for 2012 or 2013. Father testified that from August 2013 to February 2014 he was unemployed; however, between February and May 2014, he testified to having had several full time jobs paying around $10 per hour.[10] Father also testified that during this time he was living in an office owned by his parents, paid no rent, and had very few expenses.

Based on this testimony, the trial court correctly concluded that Father had the means to provide support for his child through continuing his successful long term business or seeking alternative employment. *See In re Caira D.*, No. M2014-01229-COA-R3-PT, 2014 WL 6680696, at *6 (Tenn. Ct. App. Nov. 25, 2014); *In re Christopher J. B., Jr.*, No E2014-00489-COA-R3-PT, 2014 WL 504442, at *7 (Tenn. Ct. App. Oct. 9, 2014) (finding that able-bodied parents who were employed, or capable of employment, even if not working continuously, were acting willfully in failing to pay child support.)

Based on the foregoing and other evidence in the record, we affirm the juvenile court's conclusion that Father abandoned the child pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i) by willfully failing to provide support within the four month statutory period.

---

arrest for aggravated assault, and lasted only a week. His second incarceration began on September 23, 2014, as a result of a violation of his probation. Thus, because Father was not incarcerated on April 8, 2014, the date in which the petition to terminate his parental rights was filed, or during the preceding four months, the relevant statutory period is the four month period preceding the petition.

[10] In February and March of 2014, Father obtained work through two temporary employment agencies and made $10 an hour working forty hour weeks. In March, Father began working for a car dealership and testified that he made around $20 an hour. In May he began working for a landscaping company. These jobs were short in nature, lasting around two weeks each, until Father's employers were informed that he was a convicted felon or some other disagreement led to Father's departure.

## C. Abandonment by Failure to Visit

In addition to abandonment by failure to support, the juvenile court found that Father abandoned the child due to his failure to visit. As previously stated, Tenn. Code Ann. § 36-1-102(1)(A)(i) provides that, for the purposes of terminating the parental rights of a parent, "abandonment" can be found when the parent has willfully failed to visit the child for a period of four consecutive months immediately preceding the filing of a preceding or pleading to terminate the parental rights of the parent. The statute defines "willfully failed to visit" as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" means "visitation, under the circumstances of the individual case, constitut[ing] nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

In this case, Father does not dispute that he failed to visit the child during the relevant statutory four month period.[11] Instead, he argues that his actions were not willful because his contact with the child had been suspended by court order.

Here, Father was ordered to have no contact with the child or DCS employees beginning in July 2013 due to justifiable safety concerns; however, the court expressly stated that the no-contact order could be lifted upon Father presenting himself in court. Despite this invitation, Father made no attempts to restore visitation until after the child's mother died in January 2014. In fact, Father failed to appear at the next scheduled hearing, which was held on August 20, 2013, for which Father had notice. Moreover, it is significant to note that Father had appointed counsel at all material times and yet more than seven months expired before Father made any effort to restore visitation, despite the court's overture to consider restoring visitation if Father would appear in court.

As we have stated in other cases, in the context of statutes governing the termination of parental rights, "willfulness" does not require the same degree of culpability as is required by the penal code and does not require malevolence or ill will. *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005). "Willful conduct consists of acts or *failures to act* that are intentional or voluntary rather than accidental or inadvertent." *Id*. (emphasis added).

Here, Father failed to take any affirmative steps to regain contact with his child during the relevant statutory period. Therefore, we conclude that Father's conduct was willful. *Compare In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (concluding that the

---

[11] As discussed previously, the petition to terminate Father's parental rights was filed on April 8, 2014. Thus, the relevant period is from December 7, 2013, to April 7, 2014.

parent's failure to visit was willful when he did not take further court action to request custody or visitation and had no good reason for his failure to do so); *with In re Adoption of A.M.H.*, 215 S.W.3d 793, 811 (Tenn. 2007) (holding that parents' failure to visit was not willful when they "actively pursued legal proceedings to regain custody" of their child). Accordingly, the trial court properly determined that Father abandoned his child by failing to visit.

### D. Abandonment by Failure to Provide a Suitable Home

Additionally, the juvenile court found that Father abandoned his child due to his failure to provide a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii) provides that abandonment may also exist when:

> The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child . . . and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department.

Tenn. Code Ann. § 36-1-102 (1)(A)(ii). "Termination for failure to provide a suitable home requires a finding, supported by clear and convincing evidence, that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, 2015 WL 4197220, at *6.

In this case, the child was placed in DCS custody on March 21, 2013. Thus, the relevant statutory period of four months following removal spans from March 21, 2013, to July 21, 2013.

A "suitable home requires more than a proper physical living location." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). "It requires that the home be free from drugs and domestic violence." *Id.* In this case, Father lost his home in June of 2013. Thereafter, he was unable to provide DCS with proof of stable housing and at times lived

in an office building owned by his parents. However, even prior to this period Father's living situation was unsuitable due to his habitual drug usage and failed drug screenings.

The foregoing notwithstanding, Father contends that DCS failed to make reasonable efforts to assist him in providing a suitable home or fulfilling his obligations under the parenting plan. We find this contention disingenuous because Father threatened DCS caseworkers to such an extent that the trial court ordered Father to have no direct contact with them; his only contact had to be through his attorney. Moreover, prior to the no contact order, the record clearly reveals that Father failed to follow recommendations or to take advantage of the efforts of DCS workers to assist him in completion his goals under the plan. Further, he failed to complete anger management courses as recommended by his psychological evaluation.

As we have noted many times, "DCS's efforts do not need to be 'Herculean.'" *Id.* DCS is required to use its "superior insight and training to assist parents with the problems DCS has identified in the permanency plan, whether the parents ask for assistance or not." *State, Dep't of Children's Servs. v. Este*s, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008). DCS does not bear the sole responsibility. Parents also must make reasonable efforts toward achieving the goals established by the permanency plan to remedy the conditions leading to the removal of the child. *Id.* The burden is on the state to prove by clear and convincing efforts that its efforts were reasonable under the circumstances. *Id.*

The record indicates that DCS assisted Father by setting up visitations, setting up random drug screens, requesting pill counts, setting up psychological assessments, providing budget forms, and informing Father of other free community resources such as Narcotics Anonymous meetings and counseling. Further, Father testified that he was provided a list with houses or halfway houses, and places where he could obtain a "cheap home." Based on these facts, we conclude that DCS has met its burden of showing that reasonable efforts were made to assist Father in obtaining a suitable home.

Accordingly, we affirm the trial court's conclusion that Father has abandoned his child by failing to provide a suitable home.

## II. BEST INTERESTS OF THE CHILD

If one of the statutory grounds for termination is proven by clear and convincing evidence, a parent's rights may be terminated if it is also determined that termination of the parent's rights is in the best interests of the child. *In re Heaven L.F.*, 311 S.W.3d at 440; *In re D.L.B.*, 118 S.W.3d at 367. Here, Father argues that the evidence did not clearly and convincingly demonstrate that it was in the child's best interests to terminate his parental rights.

The legislature has identified nine statutory factors for the court to consider in making a best interests analysis, *see* Tenn. Code Ann. § 36-1-113(i); however, this list is not exhaustive, and the court need not find the existence of every factor before it may conclude that terminating a parent's parental rights is in the best interests of a child. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Further, in considering a petition to terminate parental rights, the court is called to make a determination of the child's best interests from the perspective of the child rather than the parent. *In re Heaven L.F.*, 311 S.W.3d at 441.

One of the statutory factors to be considered is whether the physical environment of the parent's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner. *See* Tenn. Code Ann. § 3-36-113(i)(7). In this case, the trial court found that, since June 2013, Father has had no home to which the child may return, but has been residing in an office owned by his parents. Moreover, although Father was drug free during the later portion of this case, he tested positive for illicit substances on several occasions, missed numerous drug screenings, and was unable to provide adequate pill counts. Therefore, we conclude that this factor favors termination.

Another statutory factor is whether the parent has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian is a statutory factor the trial court considered. *See* Tenn. Code Ann. § 36-1-113(i)(1). The trial court found that Father had "not made any adjustment of his circumstances, conduct, or conditions as to make it safe and in the child's best interests" to be in Father's home. This conclusion is fully supported by the record. Since the beginning of this case, Father has been charged, convicted, and incarcerated on several occasions. Additionally, Father lost his home and was unable to meet the majority of the requirements of his permanency plan.

Whether the parent has maintained regular visitation or other contact with the child and whether a meaningful relationship has been established between the parent or guardian and the child are also factors to be considered. *See* Tenn. Code Ann. §§ 3-36-113(i)(3) & (4). Here, Father was permitted visitation with his daughter until from March to June 2013. During this period, he only visited the child three times. Beginning in July 2013, Father's visitation was suspended due to his drug usage and threatening statements to others, and for the next several months Father took no affirmative steps to restore visitation with his child, despite an express invitation by the court to do so. Even after Father was permitted to resume contact with the child via letters, he wrote only three letters. This lack of contact for an extended period of time has effectively eroded any meaningful father-daughter relationship. Thus, we conclude that these factors favor termination.

Additionally, the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition is a factor to be considered. *See* Tenn. Code Ann. § 36-1-113(i)(5). The trial court found that the child has developed a strong parent-child relationship with her resource parents who are responsible adults that care for her needs. We agree with the trial court's conclusion that removing the child from this stable and predictable environment would be detrimental and harmful to the child.

Based on these and the juvenile court's other findings, we conclude that the evidence clearly and convincingly supports the juvenile court's ruling that termination of Father's parental rights is in the child's best interests.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Father.

_____
FRANK G. CLEMENT, JR., JUDGE