IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 6, 2009 Session

## *In re* T.D.M.C. AND D.M.A.

**Appeal from the Juvenile Court for Dickson County**
**No. 07-08-062-CC     A. Andrew Jackson, Judge**

---

**No. M2009-00475-COA-R3-PT - Filed October 12, 2009**

---

Mother appeals from a juvenile court order terminating her parental rights to her two children. Father appeals an order terminating his parental rights to his child with Mother. Finding clear and convincing evidence to support the juvenile court's determination, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., joined. PATRICIA J. COTTRELL, P.J., M.S., not participating.

Anita Lynn Vinson Coffinberry, Erin, Tennessee, for the appellant, J.S.A.

James Leonard Baum, Burns, Tennessee, for the appellant, M.H.D.M.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Douglas Earl Dimond and Joshua Davis Baker, Assistant Attorneys General; for the appellee, State of Tennessee.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

M.H.D.M. ("Mother") is the mother of T.D.M.C., born May 2005, and D.M.A., born August 2006. J.S.A. ("Father") is the father of D.M.A.[1] The Department of Children's Services ("DCS")

---

[1] J.S.A. was not established as the legal father of D.M.A. and ordered to pay child support until November 2007, after D.M.A. was in state custody. At trial, Mother referred to her husband, W.F.C., as T.D.M.C.'s "father." However, Mother identified another man as T.D.M.C.'s biological father. Mother was married to W.F.C. at the time of T.D.M.C.'s birth and remained married to W.F.C. at the time of these proceedings despite having lived apart from him most of the time T.D.M.C. and D.M.A. were in state custody.

first filed a petition to terminate Mother's and Father's parental rights on April 23, 2008.[2] DCS voluntarily dismissed its petition on June 11, 2008, and filed a second petition to terminate parental rights on July 28, 2008. On February 17, 2009, the juvenile court issued an order terminating the parental rights of both Mother and Father, concluding that the petitioners clearly and convincingly established statutory grounds and that termination was in the best interest of the children.

DCS first became involved with T.D.M.C. on May 4, 2005, after receiving a referral on the basis that Mother's parental rights to two other children in state custody were subject to termination proceedings. At the time, Mother was unemployed and living with relatives in Burns, Tennessee. DCS placed family support services in the home to assist Mother in caring for T.D.M.C. DCS received a second referral on June 12, 2005, and discovered that Mother was staying with the sister of the father of one of Mother's other children. This man is a registered sex offender, and the sister stated that he visited the house frequently. DCS arranged for T.D.M.C. to stay with a relative until Mother could establish a stable home and begin working with DCS support services.

On July 22, 2005, DCS filed a petition to have T.D.M.C. adjudicated dependent and neglected. T.D.M.C. was removed from Mother but was returned in May 2006; family support services remained in the home. After T.D.M.C. was returned to her, Mother was arrested and convicted for shoplifting. She was evicted from her apartment in August 2006 for failure to pay rent. D.M.A. was born that same month.

In October and November 2006, DCS was unable to locate Mother. In November 2006, a juvenile court gave DCS temporary custody of T.D.M.C. and D.M.A. on the basis that the children could not be located, Mother had failed to comply with a court order that she contact her case manager every week, and Mother's instability made it difficult for her to parent the children. DCS contacted relatives of Mother to attempt to discover her whereabouts and ultimately reported the children as missing to the Dickson Police Department. Mother finally contacted DCS on December 11, 2006, and stated that she had taken the children to Texas and would return to Tennessee at the end of the month. However, on January 9, 2007, Mother called DCS and stated that she intended to remain in Texas and had no plans to return to Tennessee.

Mother returned to Tennessee in January 2007 and moved in with a brother. When DCS attempted to conduct a study of his home, he refused to let the case worker inside. T.D.M.C. and D.M.A. were removed from Mother and placed in a foster home on March 27, 2007. Mother was arrested in April 2007 for violating the terms of her probation for shoplifting by failing to report to her probation officer. She was incarcerated from April-October 2007.

Permanency plans were implemented for D.M.A. and T.D.M.C. on April 12, 2007, and May 23, 2007, respectively. Under the plans, Mother was required to contact DCS to schedule visitation and cooperate with DCS regarding visitations; undergo parenting, clinical, and drug and alcohol

---

[2] DCS also sought to terminate the parental rights of W.F.C., but the matter was continued for proper service of process to be completed.

assessments and follow all recommendations; submit to a home study once a residence was established; submit to random drug screens; refrain from involvement in illegal drug activities; and resolve all legal issues.

In June 2007, Mother underwent an alcohol and drug assessment which indicated that she did not have a problem that required additional treatment. Mother's parenting assessment revealed that she lacked the ability to properly discipline her children or to manage her own life. It was recommended that she participate in parenting skills education and individual counseling to help her become self-sufficient. Mother met with a family counselor three times from July to September 2007, while she was incarcerated, to work on parenting skills and personal management skills like balancing a checkbook. A DCS social worker met with Mother in October 2007 shortly before her release from jail to advise her about the importance of finding a job and complying with the terms of the permanency plans.

Mother obtained a job with Bridgestone in January 2008 but was fired in March because of tardiness and failure to show up to work. The state of Texas had previously suspended Mother's driver's license for knowingly failing to pay a fine. Once the license was suspended, Mother claimed she was unable to pay the fees to have it reinstated and was therefore forced to rely on her brother for transportation. Mother alleged that she was fired from Bridgestone because her brother was late picking her up for work two times and because she had to miss work once with the flu.

New permanency plans for T.D.M.C. and D.M.A. were entered and signed by Mother on April 17, 2008. Mother's obligations under the plan were to cooperate with DCS and follow all rules regarding visitation; complete parenting education classes; receive counseling as recommended from the parenting assessment; secure and maintain employment; provide financial support for her children; find adequate housing, submit to a home study, and provide a safe and stable home for her children; resolve all legal issues; submit to random drug screens; refrain from involvement in illegal activities; abide by all court orders; and keep DCS informed of her whereabouts.

Shortly thereafter, Mother was arrested for driving on a suspended license and ordered to spend weekends in jail from April to June 2008. DCS provided Mother with supervised visitation services in April 2008. However, Mother refused to participate in the parenting skills training, maintaining that she did not need such training. Mother was arrested and incarcerated again from June 19 to August 20, 2008, for failure to pay court fines. A family services counselor provided services to Mother for four months in the fall of 2008 in an attempt to assist her in stabilizing her lifestyle. The counselor was only able to meet with her five times during the four-month period because he had trouble contacting her and because of her most recent incarceration.

DCS petitioned the Dickson County Juvenile Court to terminate Mother's parental rights to T.D.M.C. and D.M.A. on July 28, 2008. At the time of trial, Mother was living in federally subsidized housing, and her brother was paying her rent of $61 per month because she could not afford it. As of July 31, 2008, Mother had not visited her children since May 2, 2008. Mother was unemployed and had failed to make any child support payments.

Father's circumstances since D.M.A.'s birth were similarly unstable. Father's obligations under the April 12, 2007 permanency plan for D.M.A. were to submit to a paternity test to establish that he was the father of D.M.A.; consistently visit D.M.A.; keep DCS informed of his whereabouts; attend all meetings and court hearings regarding D.M.A.; abide by all court orders; complete a parenting assessment and follow all recommendations; complete parenting classes; provide financial support for D.M.A.; and submit to a home study.

Prior to June 2007, Father had been arrested on drug-related charges. On June 7, 2007, he was arrested for aggravated robbery and aggravated assault. On February 12, 2008, Father pled guilty to drug and aggravated assault charges. He was sentenced to eight years of community corrections. As part of his sentence, he was also required to maintain employment and submit to drug screens. He tested positive for marijuana on four occasions during this time and failed to meet the requirements of his community corrections sentence.

Under the terms of the April 17, 2008 revised permanency plan, Father was required to contact and cooperate with DCS regarding the scheduling of visitation; consistently visit and work on building a relationship with D.M.A.; complete parenting education classes; abide by all court orders; keep DCS informed of his whereabouts; attend all meetings and doctor's appointments regarding D.M.A.; provide financial support for D.M.A.; and submit to a home study.

On December 11, 2007, the juvenile court ordered Father to begin making child support payments for D.M.A. Father was ordered to pay $54.46 per week in child support and $5.54 per week in arrearage payments beginning December 14, 2007. Father was employed from April 16, 2008, until July 15, 2008, when he was fired. Father paid a total of $580.04 in child support from the entry of the order in December until he was fired. Under the court order, his total obligation for that seven-month period was approximately $1800.

After a parenting assessment, it was recommended that Father complete parenting education and participate in therapeutic visitation with D.M.A. Lou Jerrett began providing therapeutic visitation services for Father in November 2007 and parenting services in January 2008. She testified that she had difficulty scheduling training and visitation with him because he did not have transportation and because of his work and drug rehabilitation schedule. Natasha Schuler worked with Father from March to May 2008 providing supervised visitation and parenting instruction. Ms. Schuler initially transported D.M.A. to Father's sister's home for visits, but the visits stopped when Father's sister forced him out of her home. Father then moved in with a friend but did not give Ms. Schuler his new contact information. At that point, Ms. Schuler recommended that the supervised visitation stop because Father lacked stable housing and D.M.A. could not be taken to a home for visitation until a home study had been completed. Ms. Jerrett again provided visitation and parenting services for Father from June through August 2008. From November 2007 to August 2008, Father participated in ten supervised visits and eight parenting sessions. Ms. Jerrett testified that Father visited D.M.A. very sporadically, sometimes going a month at a time without visiting.

In September 2008, Father had another child with his fiancee, Ashley Sweeney. Becky Parker, a DCS court liaison, conducted a study of their home because Ms. Sweeney had petitioned the court for unsupervised visitation of her own two children. Father was not then employed but told Ms. Parker that he was about to begin a construction job, although he did not know the name of the company. Later he told her that he quit that job because they would not pay him commission and that he had begun to work for a carpet gallery. When Ms. Parker called to confirm his employment, no one at the carpet gallery knew of Father. As part of her investigation, Ms. Parker discovered that Ms. Sweeney had convictions for DUI and theft and a pending assault charge for an incident that occurred while she was pregnant. Ms. Sweeney's own mother initially provided a favorable reference as part of the home study, but she later withdrew her reference because of an incident in which she discovered Father and Ms. Sweeney had engaged in excessive drinking and drug use while they were supervising a thirteen-year-old. On a separate occasion, a DCS investigation revealed that Father and Ms. Sweeney had exposed two minors to drugs and alcohol during a trip to Nashville. The Hickman County Juvenile Court denied Ms. Sweeney's petition for unsupervised visitation.

At the time of trial, T.D.M.C. and D.M.A. were living with a foster family in Clarksville where they had resided for almost a year. The foster parents wished to adopt them both. At the time the children came into custody, T.D.M.C. could not or would not speak at all, despite being nearly three years old. D.M.A. was eighteen months old and could not say a single word. Additionally, both children had serious digestive problems. T.D.M.C.'s foster mother testified that, on the advice of his primary care physician, he had been seeing a therapist to work on anger and stress management and was close to being accepted into a preschool for children who are developmentally delayed due to circumstance. Janita Oakes, a clinical social worker with Centerstone Mental Health Centers, testified that T.D.M.C. exhibited aggressive behavior when he first came into custody. She testified that he had progressed immensely in his behavior and functioning since living in a stable home consistently for the past year.

STANDARDS FOR TERMINATION OF PARENTAL RIGHTS

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Terminating a person's parental rights "has the legal effect of reducing the parent to the role of a complete stranger." *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005). Pursuant to Tenn. Code Ann. § 36-1-113(l)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, 2005 WL 1021618, at *7 (citing Tenn. Code

Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)*; In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code. Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *Id.* at 654. As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

ANALYSIS

A party seeking termination of parental rights must prove two elements by clear and convincing evidence: the existence of one of the statutory grounds for termination and that termination is in the child's best interest. *In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009); *In re Valentine*, 79 S.W.3d at 546; Tenn. Code Ann. § 36-1-113(c). In the present case, neither Mother nor Father challenges the trial court's finding that termination is in the best interest of T.D.M.C. and D.M.A.

A trial court is only required to find one statutory ground for termination of parental rights under Tenn. Code Ann. § 36-1-113(g). *In re D.L.B.*, 118 S.W.3d at 367. At the conclusion of proof in the present case, the trial court ordered that Mother's parental rights to T.D.M.C. and D.M.A. be terminated on three statutory grounds: abandonment, substantial noncompliance with the permanency plans, and the persistence of conditions that prevent the return of the children.[3] The trial court ordered that Father's parental rights to D.M.A. be terminated on two statutory grounds: abandonment and substantial noncompliance with the permanency plans. We have concluded that

---

[3] Because the order adjudicating the children as dependent and neglected was not made part of the record, DCS does not argue the abandonment ground for parental termination on appeal.

the petitioners clearly and convincingly established statutory grounds for termination with respect to both parents.

## Mother

The trial court found that Mother failed to substantially comply with the permanency plans implemented for T.D.M.C. and D.M.A. pursuant to Tenn. Code Ann. § 36-1-113(g)(2). Mother signed permanency plans for D.M.A. and T.D.M.C. on April 12 and May 23, 2007. These plans required Mother to cooperate with DCS in scheduling visitations; undergo parenting, clinical, and drug and alcohol assessments and follow all recommendations; submit to a home study after establishing a residence; submit to random drug screens; refrain from involvement in illegal drug activities; and resolve all legal issues. Mother obtained parenting and drug and alcohol assessments while she was incarcerated. The parenting assessment revealed that Mother lacked the abilities to discipline her children properly and manage her own life. As a result, Mother participated in four parenting skills classes while she was incarcerated. But upon her release from jail, she ceased to cooperate with DCS. Mother briefly held a job for two months in 2007, but she was fired for tardiness and failing to show up to work. Mother was also unable to establish a stable residence. When she was not incarcerated, she lived with her brother who refused to submit to a DCS home study.

New permanency plans were entered for both children on April 17, 2008. Under this plan, Mother was required to cooperate with DCS regarding visits; undergo parenting assessment and follow all recommendations; complete parenting classes; secure and maintain employment; provide financial support for T.D.M.C. and D.M.A.; find adequate housing, submit to a home study, and provide a safe home; resolve all legal issues; submit to random drug screens; refrain from involvement in illegal activities; abide by all court orders; and keep DCS informed of her whereabouts. DCS assisted Mother in fulfilling these requirements by arranging parenting skills training, family services counseling, and therapeutic visitation with the children. Mother insisted, however, that she did not need parenting skills training and stopped attending classes. Mother never held a job after the April 17, 2008 permanency plan was entered. She did not establish a residence until the fall of 2008 and only managed then because her brother paid her rent of $61 per month.

Perhaps most significantly, Mother was unable to stay out of jail. Mother was incarcerated from April to October 2007 for knowingly violating the terms of her probation by leaving the state without permission and failing to meet with her probation officer. Mother was arrested again in April 2008 for driving on a suspended license and consequently spent weekends from April to June 2008 in jail. Finally, Mother was incarcerated from June 19 to August 20, 2008, for failure to pay court fines. During this time period, Mother failed to notify DCS when she was arrested, and DCS was frequently unable to contact her when she was not in jail.

The trial court also found that conditions persisted that prevented the children's safe return to Mother pursuant to Tenn. Code Ann. § 36-1-113(g)(3). A court may terminate parental rights

when a child has been removed for a period of six months and all of the three following conditions are met:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

The conditions that led to the removal of T.D.M.C. and D.M.A. centered around Mother's inability to financially support her children and provide them with a safe and stable home. These conditions persisted after the children's removal. Mother was incarcerated for six months in 2007 and two months in 2008, in addition to spending weekends in jail for two months in 2008. At the time of trial from November 2008 to January 2009, Mother had only been employed for a total of two months since the date of the children's removal. Mother had no stable housing, moving around between the homes of relatives and friends. Mother had finally acquired housing at the time of trial but was unable to pay rent in the amount of $61 per month. During the nearly two-year period that T.D.M.C. and D.M.A. were in state custody, Mother was unable to support herself or change her circumstances. Since Mother had not secured an income or stable housing at the time of trial, there was no indication that the conditions that led to the children's removal could be rectified in the near future. Furthermore, the children had the opportunity to be integrated into a safe, stable, and permanent home. T.D.M.C.'s and D.M.A.'s foster parents wished to adopt them, and DCS workers testified that the children thrived under their care.

In response to the trial court's findings, Mother alleges that DCS failed to exercise reasonable efforts to reunite her with T.D.M.C. and D.M.A. Under Tenn. Code Ann. § 37-1-166(a)(2), before terminating parental rights, the trial court must make a determination that "reasonable efforts" have been made that "[m]ake it possible for the child to return home." DCS has the burden of proving by clear and convincing evidence that it made reasonable efforts. Tenn. Code Ann. § 37-1-166(b); *In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App. 2008). "Reasonable efforts" is defined as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). Courts consider several factors in determining the reasonableness of DCS's efforts, including the following:

(1) [T]he reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006). The health and safety of the child are the chief concern. Tenn. Code Ann. § 37-1-166(g)(1).

Mother claims that DCS did not exercise reasonable efforts to assist her in finding a job and obtaining stable housing. Mother points to a lack of transportation as the primary factor in both her failure to substantially comply with the permanency plan and the persistence of conditions. She argues that without transportation, she could not obtain a job, nor maintain stable housing.

Mother relies on the testimony of Joy Walden, a DCS case worker, who stated that the original termination petition filed by DCS was voluntarily dismissed because DCS felt it had not shown reasonable efforts to assist Mother. However, DCS's decision to make *additional* efforts to assist Mother in remedying her situation before seeking termination does not necessarily require a finding that DCS did not make *reasonable* efforts to reunite T.D.M.C. and D.M.A. with Mother. DCS attempted to assist Mother in her development, offering parenting skills training, personal management skills training, and individual counseling to help her become self-sufficient. A counselor met with Mother while she was incarcerated to advise her about the importance of finding a job upon her release. DCS provided supervised visitation services for Mother while she was incarcerated and offered to arrange transportation upon her release so that she could visit her children. Mother testified that it was the foster care review board that recommended that she seek housing in the low income development in which she was residing at the time of trial. DCS even offered to pay Mother's monthly rent and utilities if she paid the initial deposits.

Additionally, as Mother acknowledges, it was not DCS's responsibility to provide Mother with the transportation needed to obtain employment. This court has noted the significant responsibility of parents in the reunification effort:

The Department does not have the sole obligation to remedy the conditions that required the removal of children from their parents' custody. When reunification of the family is a goal, the parents share responsibility for addressing these conditions as well. Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody.

*In re Giorgianna H.*, 205 S.W.3d at 519. Mother only managed to obtain one job during the nearly two-year period that T.D.M.C. and D.M.A. were in state custody. She was fired from that position

for failure show up on time or at all, and there is no indication that lack of transportation was an obstacle in at least *obtaining* another job.

Moreover, the condition that led to Mother's transportation predicament was one that rested solely on Mother's shoulders. Mother knowingly failed to pay the original ticket she was issued, and as a result, she claimed that it would cost more than $1000 to have her license reinstated. However, even when Mother had a source of income for a two-month period in early 2008, she paid nothing toward having her license reinstated, which should have been an obvious priority for someone in her situation.

Noting the interrelated nature of the challenges facing parents confronted with termination petitions, this court has stated that trial courts must consider DCS's *overall* efforts to assist a parent in determining whether DCS made reasonable efforts to reunite the family. *State v. Estes*, 284 S.W.3d 790, 802 (Tenn. Ct. App. 2008). Like Mother in the present case, the mother in *Estes* alleged that DCS did not exercise reasonable efforts in helping her find a job. *Id.* at 801. The mother relied on testimony from a DCS caseworker about DCS's efforts to help her find a job in light of the mother's own efforts to do so:

> [W]e explained to her how to help her look for a job. But when she was telling us that she was actually looking for something, we told her to call us if she needed us. Because at that time, she was looking into being a waitress and had sent out applications. . . . It's not that we were or were not helping her. Because our responsibility is to allow them to be able to do things for themselves.

*Id.* Much like Mother in the present case, the mother in *Estes* needed DCS's help to "stay out of jail, find suitable housing, visit her children, find employment, and obtain an assessment and counseling to obtain insight and skills to overcome her obstacles." *Id.* at 802. The circumstances in *Estes* are not unlike Mother's in the present case:

> [W]hen Mother was not in jail, she moved around often and failed to stay in contact with DCS, which resulted in the caseworker spending valuable time looking for Mother and trying to contact her. . . . Mother failed to take advantage of services that would have helped her cope with her problems. DCS made efforts to help Mother obtain subsidized housing . . . . Finally, Mother's repeated stints in jails were a continuing obstacle. The trial court found that DCS provided job counseling to Mother during the intervals in which she was not incarcerated . . . . Mother clearly knew how to apply for a job and in fact obtained a job at a motel, before losing it because of another arrest.

*Id.* at 802. Given these facts, the *Estes* court concluded that DCS exercised reasonable efforts to reunite the mother with her children. *Id.* at 802-03. We likewise find that the record in the present case clearly and convincingly supports the trial court's finding that DCS made reasonable efforts to provide Mother with the support and services she needed to be reunited with her children.

Mother also claims to have substantially complied with the majority of the responsibilities outlined in the permanency plans. However, she acknowledges that she failed to complete parenting counseling, parenting education, and issues dealing with employment and income. Mother was employed only two months during the nearly two years that T.D.M.C. and D.M.A. were in state custody and was unable to support even herself in a stable home. There is nothing in the record to indicate that substantial compliance with the permanency plans was a possibility at the time of trial.

The evidence does not preponderate against the trial court's findings. The evidence clearly and convincingly establishes the existence of two of the statutory grounds found by the trial court for termination of Mother's parental rights.

Father

The trial court found that Father abandoned D.M.A. pursuant to Tenn. Code Ann. § 36-1-113(g)(1). The court's order specifically refers to abandonment as defined in Tenn. Code Ann. § 36-1-102(1)(A)(i):

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

For the purposes of this provision, "willfully failed to support" or "willfully failed to make reasonable payments toward the support of the child" means the willful failure to provide monetary support or provide more than token payments toward the support of the child for a period of four consecutive months. Tenn. Code Ann. § 36-1-102(1)(D). "Token support" refers to support that is insignificant given the parent's means under the circumstances. Tenn. Code Ann. § 36-1-102(1)(B).

During the four months preceding the filing of the petition, Father paid $580.04 in child support. His total obligation during that seventeen-week period was $1020. Father disputes the trial court's finding that this amounted to mere token payment. The court noted that Father was able-bodied and not incarcerated in the four months before the filing of the petition on July 28, 2008. In fact, Father was employed by Fastenol from April 16 to July 15, 2008, during which time his wages were garnished to satisfy his child support obligation. We disagree with the trial court's characterization of this amount as mere "token support." Given Father's circumstances, we find that this payment was not insignificant.

Father also challenges the trial court's finding of abandonment by willful failure to visit. For the purposes of Tenn. Code Ann. § 36-1-102(1)(A)(i), "willfully failed to visit" means the willful failure to visit or engage in more than token visitation for a period of four consecutive months. Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is defined as "perfunctory visitation or

visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

Father avers that his failure to visit D.M.A. was not willful because DCS failed to continue visitation through another provider when the original provider was changed after Father's last visit in August 2008. Contrary to Father's assertions, the record simply does not reflect that DCS failed to continue visitation through another provider after August 2008. Lou Jerrett, a DCS service provider, testified that she was informed around that time that the visitation provider was being changed. However, nothing in the record indicates that services were actually discontinued. In fact, the record made by the DCS case manager documenting contact with the family reflects just the opposite. The August 28, 2008 entry states that "[Father] continues to not visit consistently, canceling visits for various reasons." The September 30, 2008 entry is similar: "[V]isitation for [T.D.M.C.] and [D.M.A.] with their parents has been provided and not been utilized by the parents, [Mother] or [Father]. The Department has provided supervised visitation and parenting education for both parents."

Moreover, Father's visits with D.M.A. were sporadic at best even when he was visiting. Sometimes a month or more passed between visits. The case manager's entry for July 31, 2008, reflects this pattern: "[Father] had two visits in June and one in July. The visits were the only ones in the last four months." According to Ms. Jerrett, it was very difficult to assess Father's parenting skills and evaluate whether D.M.A. had any type of bond with him because of his irregular visits. Finally, the relevant time period for the determination of abandonment was four months before the filing of the petition to terminate, or March 28 through July 28, 2008, before the time when Father claims his visitation was terminated in August 2008. The evidence does not preponderate against the trial court's finding of abandonment with respect to Father's willful failure to visit.

The trial court also found that Father failed to substantially comply with the permanency plans implemented for D.M.A. pursuant to Tenn. Code Ann. § 36-1-113(g)(2). Father signed a permanency plan on April 12, 2007, that required him to submit to a paternity test; consistently visit D.M.A.; inform DCS of his whereabouts; attend all meetings and court hearings regarding D.M.A.; abide by all court orders; undergo a parenting assessment and follow all recommendations; complete parenting education; provide financial support for D.M.A.; and submit to a home study. Father failed to substantially comply with this plan. On June 7, 2007, he was arrested for aggravated robbery and aggravated assault. Father was sentenced to eight years of community corrections. He tested positive for marijuana on four occasions and failed to meet the requirements of his community corrections sentence. He paid nothing in child support to D.M.A. during this time.

The April 17, 2008 permanency plan required Father to cooperate with DCS regarding visitation; consistently visit and build a relationship with D.M.A.; complete parenting education; abide by all court orders; inform DCS of his whereabouts; attend all meetings regarding D.M.A.; provide financial support for D.M.A.; and submit to a home study. Father failed to substantially comply with the terms of the permanency plan. Father paid a total of $580.04 in child support, significantly less than the amount he was ordered to pay by the court. His visits with D.M.A. were

sporadic, making it difficult to ascertain whether the two had developed a relationship. Father lacked a stable home, living alternately with family, friends, and finally his fiancee. Father and his fiancee failed a DCS home study and exposed minors to drugs and alcohol on two different occasions. At the time of trial, Father was incarcerated awaiting trial on a felony burglary charge. His probation officer testified that she filed a violation of probation revoking his community corrections sentence, ensuring that he will serve some time in jail.

As a challenge to the trial court's finding that Father did not substantially comply with the permanency plan, Father asserts that DCS failed in its duty to make reasonable efforts to reunite the family pursuant to Tenn. Code Ann. § 37-1-166(a)(2). Father insists that DCS failed to provide him any assistance in obtaining his own residence, procuring employment, or resolving his legal issues. Father asserts that DCS instead focused exclusively on visitation and parenting education.

Father acknowledges that it was not DCS's responsibility to give him a job but insists that he should have been given job training. However, during the approximately eighteen-month period of time that DCS worked with Father, he often informed DCS that he was employed. He claimed to have held jobs with a construction company, a carpet gallery, and Fastenol, the only employer that was actually confirmed. Father was clearly not seeking job training from DCS if he was actively concealing the fact that he was unemployed. As with Mother, it was not DCS's sole responsibility to remedy the conditions that led to D.M.A.'s removal from Father. "[P]arents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519.

Father also never sought help in obtaining housing. When he moved from his sister's home to the home of a friend, he failed to give DCS his new contact information. When he finally began living at his fiancee's house, they failed a home study. Similarly, it is difficult to imagine what kind of help DCS could have offered Father to resolve his legal issues when he was arrested for aggravated robbery and aggravated assault and then violated the terms of his community corrections sentence by using drugs and being arrested for burglary.

Furthermore, Father failed to complete even the elements of the permanency plan upon which he claims DCS focused its efforts exclusively—visitation and parenting education. Father failed to complete parenting education, and his visits with D.M.A. were sporadic and infrequent. There is no indication that a lack of effort from DCS was the reason that Father failed to substantially comply with the terms of the permanency plans.

The evidence does not preponderate against the trial court's findings. The evidence clearly and convincingly establishes the existence of two of the statutory grounds found by the trial court for termination of Father's parental rights.

The judgment of the trial court is affirmed. Costs of appeal are assessed equally against the appellants, for which execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE