# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 19, 2012 Session

## IN RE: ISOBEL V. O. and BREE'ANA J. A.

**Direct Appeal from the Juvenile Court for Rutherford County**
**No. TC1542    Donna Scott Davenport, Judge**

---

**No. M2012-00150-COA-R3-PT - Filed November 8, 2012**

---

The trial court terminated the parental rights of Mother and Father based on abandonment for failure to support and failure to provide a suitable home, substantial noncompliance with the permanency plan, and persistence of conditions. We reverse termination on the grounds of abandonment, and affirm termination of parental rights on the grounds of substantial noncompliance with the permanency plan and persistence of conditions. We also affirm the trial court's determination that termination of parental rights is in the best interests of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in part, Reversed in part and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Carl Richard Moore, Murfreesboro, Tennessee, for the appellant, Father.

Mark J. Downton, Nashville, Tennessee, for the appellant, Mother.

Robert E. Cooper, Attorney General and Reporter and Mary Byrd Ferrara, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

This is a termination of parental rights case involving two minor children, Bree'ana J. A. (born 5/8/2007) and Isobel V. O. (born 5/22/2009). Mother is the mother of both

children; Father is the father of Isobel. Bree'ana's father apparently is unknown.[1] This lawsuit arises from a petition to terminate the parental rights of Mother and Father filed in the Juvenile Court for Rutherford County on November 2, 2010. Following a hearing over seven days in late August, September, and October 2011, the trial court terminated the parental rights of Father to Isobel and of Mother to Isobel and Bree'ana on the grounds of abandonment for failure to support and failure to provide a suitable home; persistence of conditions leading to removal of the children; and substantial noncompliance with the permanency plans. The trial court entered final judgment in the matter on December 21, 2011, and Mother and Father filed timely notices of appeal to this Court.

### *Issues Presented*

Mother and Father present the following issues for our review, as we slightly reword them:

(1)     Whether the trial court erred by terminating parental rights based on abandonment for failure to support.

(2)     Whether the trial court erred by terminating parental rights based on abandonment for failure to provide a suitable home.

(3)     Whether the trial court erred by terminating parental rights based on substantial noncompliance with the permanency plan.

(4)     Whether the trial court erred by terminating parental rights based on persistence of conditions.

(5)     Whether the trial court erred by finding that termination of parental rights was in the best interests of the children.

Father additionally asserts the trial court erred by failing to file its order within 30 days as required by Tennessee Code Annotated § 36-1-113.

### *Standard of Review*

We review findings of facts of a trial court sitting without a jury *de novo* upon the

---

[1]The petition for termination of parental rights in this case originally also was filed against an "alleged father" of Bree'ana, who subsequently was dismissed from the matter when DCS determined he could not be her biological father. No claims of paternity were identified on the putative father registry.

record with a presumption of correctness unless the preponderance of the evidence is otherwise. *In Re Angela E.*, 303 S.W.3d 240, 246 (citation omitted); Tenn. R. App. P. 13(d). Insofar as a factual finding is based on the trial court's assessment of witness credibility, we will not reverse that finding absent clear and convincing evidence to the contrary. *In Re: M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). No presumption of correctness attaches, however, to a trial court's conclusions on issues of law. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000); Tenn. R. App. P. 13(d). A trial court's conclusion that the facts of the case support a statutory ground for termination of parental rights is a question of law that we review *de novo* with no presumption of correctness. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)(citation omitted).

Tennessee Code Annotated § 36–1–113 governs the termination of parental rights. The Code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36–1–113(c)(2010). Accordingly, every termination case requires the court to determine whether the parent has engaged in a course of action or inaction that constitutes one of the statutory grounds for termination. A parent may not be deprived of their fundamental right to the custody and control of their child unless clear and convincing evidence supports a finding that a statutory ground for termination exists and that termination is in the best interests of the child. Tenn. Code Ann. § 36–1–113(c)(2010). The "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard, but does not require the certainty demanded by the "beyond a reasonable doubt" standard. *In Re: M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth. *Id*.

This heightened burden of proof in parental termination cases requires us to distinguish between the trial court's findings with respect to specific facts and the "combined weight of these facts." *In Re: Michael C. M.*, No. W2010–01511–COA–R3–PT, 2010 WL 4366070, at *2 (Tenn. Ct. App. Nov. 5, 2010) (*no perm. app. filed*) (quoting *In Re: M.J.B.*, 140 S.W.3d 643, 654 n. 35 (Tenn. Ct. App. 2004)). Although we presume the trial court's specific findings of fact to be correct if they are supported by a preponderance of the evidence, we "must then determine whether the combined weight of these facts provides

clear and convincing evidence supporting the trial court's ultimate factual conclusion." *Id*.

### *Background*

The Department of Children's Services ("DCS") initially became involved with Bree'ana and Isobel in December 2009, when it received a referral that the children were exposed to illegal drug use in their home. Mother and Father (collectively, "Parents") refused to submit to a drug screening and stated that they would continue to refuse drug screening unless it was ordered by the court. The children nevertheless were returned to Parents' care and a non-custodial permanency plan was developed wherein Parents agreed not to use illegal drugs when the children were present. Parents refused recommended drug screening and DCS lost contact with them after the family apparently was evicted from their home for failing to pay rent.

In January 2010, DCS received referral that the children were exposed to an active meth lab in their home. On January 25, 2010, Parents were arrested and DCS took the children into emergency protective State custody. Parents tested positive for methamphetamine and other illegal substances at the time of their arrest. The Juvenile Court for Rutherford County entered a protective custody order on January 27, finding that the children were without a safe or stable home. The trial court additionally found that neither Mother nor Father were employed when DCS removed the children from their care. Following hearings on January 27 and February 3, 2010, the trial court found probable cause that the children were dependent and neglected on the stipulated grounds that Mother and Father were incarcerated. The trial court awarded Parents four hours of supervised visitation per month contingent on passing a drug screening. Parents entered into permanency plans on February 11 and July 22, 2010, and on January 18, 2011. The 2010 permanency plans recited reunification and return to Parents' care as the desired goal; the January 2011 plan, which was entered after DCS filed its petition to terminate parental rights, recited adoption as the desired goal. The 2010 permanency plans required Parents to maintain sobriety and participate in drug and alcohol assessment, screening and rehabilitation; to maintain a safe and suitable home; to obtain employment in order to support the children; to provide copies of leases and a budget; to seek mental health treatment and take prescription drugs appropriately; and to not associate with known drug users. Parents also were required to attend all court hearings with respect to criminal charges against them; to follow the courts' orders; and to not incur additional criminal charges. The permanency plans additionally required Parents to participate in parenting classes and demonstrate appropriate parenting skills; maintain visitation and contact with the children; and to attend doctors appointments with the children.

Mother and Father did not have a home when they were released from incarceration

on February 14, 2010. They moved into hotels in Nashville and Dickson; Mother moved in with her mother for a time; and Parents moved into the home of a relative in Dickson. In June 2010, Parents moved into a trailer in Shelbyville. Mother and Father separated shortly thereafter, and in July the trailer burned in a fire that allegedly was the result of Father's attempt to manufacture methamphetamine. Father was charged with initiation of process to manufacture meth and was hospitalized for severe burns. Father was released from the hospital on or about August 1, 2010, and entered a Spring 2 Life residential drug rehabilitation facility. Father completed the program on January 30, 2011, and moved in with his mother. He ceased all communication with DCS in March 2011. In April, he lost employment obtained while in the Spring 2 Life program, and on June 1, 2011, he was arrested and again charged with initiation of process to manufacture meth. Father remains incarcerated and acknowledges that he is unlikely to be released at an early date.

Mother asserts that she moved "several times" after separating from Father in June 2010, but contends that she provided DCS with her leases as required by the permanency plan and that DCS visited each home and did not find them unsuitable. Following a hearing on December 3, 2010, the trial court found that Mother had made significant progress towards achieving the goals established in the permanency plan, and permitted Mother to exercise unsupervised visitation with the children on Saturdays from 10:00 a.m. until 6:00 p.m. Following a hearing on January 5, 2011, the trial court permitted Mother to take the children home for a 90-day trial home pass beginning January 7. The trial home pass was continued following a review by the trial court on February 16, 2011. Although Mother failed a hair follicle drug test on March 1, the trial court extended the trial home pass for an additional 90 days on April 6, 2011. The trial court again extended the home stay in June, finding that Mother was "doing well" and had passed drug screening and was participating in drug counseling. On July 12, 2011, the trial court upheld revocation of the trial home pass by DCS and placed the children back into DCS State custody after Mother failed a hair follicle drug test on July 1 and tested positive for methamphetamine. In its July 2011 order, the trial court set the petition to terminate parental rights filed by DCS in November 2010 to be heard on September 1, 2011.

### *Discussion*

The trial court terminated Parents' parental rights based on the grounds of substantial noncompliance with the permanency plans, abandonment for the failure to support, abandonment for the failure to provide a suitable home, and persistence of the conditions which led to removal of the children from Parents' care. The trial court further found that termination of parental rights was in the best interests of the children. Parents assert the trial court erred by determining that any ground supported termination of their parental rights and by determining that termination of parental rights was in the bests interests of the children.

Father additionally asserts that the trial court erred by failing to enter an order within 30 days of the conclusion of the hearing of the matter as required by Tennessee Code Annotated § 36-1-113(j), and requests that this Court fashion "some appropriate remedy" in the absence of a statutory remedy. Before turning to the substantive issues presented for our review, we address Father's assertion that the trial court's procedural error provides a basis for reversal. As a preliminary matter, we observe that the provision referenced by Father is contained at section 36-1-113(k), which provides:

> The court shall ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child. The court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing. If such a case has not been completed within six (6) months from the date the petition was served, the petitioner or respondent shall have grounds to request that the court of appeals grant an order expediting the case at the trial level.

Tenn. Code Ann. § 36-1-113(k)(2010).

In this case, Father does not assert that the trial court failed to make findings of fact and conclusions of law. Indeed, the trial court's order in this case contains numerous findings and conclusions of law. Rather, Father asserts the trial court erred by failing to enter its order within 30 days as provided by the statute. We repeatedly have held that the time frame contained in the statute reflects the legislature's intent that parental termination cases be handled in an expeditious manner and is not mandatory. *In re Zada M.*, No. E2010–02207–COA–R3–PT, 2011 WL 1361575, at *5 (Tenn. Ct. App. April 11, 2011) (*no perm. app. filed*) (citing *In re: M.R.W.*, No. M2005-02329-COA-R3-PT, 2006 WL 1184010 (Tenn. Ct. App. May 3, 2006)). We decline Father's request that this Court fashion a remedy for the trial court's failure to enter an order within 30 days as a matter best left to the legislature. We next turn to whether clear and convincing evidence supports the termination of parental rights in this case.

### *Abandonment for Failure to Support*

We turn first to the termination of Parents' parental rights based on abandonment for the failure to support. The Tennessee Code provides, in pertinent part:

> For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36–1–102(1)(A)(i)(2010).

"Willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36–1–102(1)(D)(2010). Section 36–1–102(1)(G) provides that "it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made." Further, every parent 18 years or older is presumed to know of their legal obligation to support their child. Tenn. Code Ann. § 36–1–102(1)(H)(2010).

DCS filed the petition to terminate parental rights in this case on November 2, 2010. Thus, the relevant period to be considered for the purposes of failure to support under the statute is July 2 through November 2, 2010. In its final order terminating the parental rights of Mother and Father, the trial court found that both Mother and Father were aware of their obligation of support based on the trial court's orders, and that they had been advised that the failure to support is a ground for the termination of parental rights. The trial court found that Mother had been able to maintain "some sporadic employment" during the course of the proceedings, that she had the ability to earn an income, and that she willfully failed to provide any "meaningful support" since the children were placed in State custody. The trial court found that although Mother had provided some food and a toy or outfit when she visited with the children, the gifts did not "rise to the level of meaningful support."

Mother asserts that the only order entered by the trial court in this case that addressed her support obligation was an adjudicatory and disposition order entered on November 9, 2010. She asserts that although the order declared that she had a duty of support, the order specifically reserved the amount of support and was not entered by the trial court until after DCS filed its petition to terminate parental rights. She additionally asserts that her failure to support was not willful. Mother asserts that the only evidence of her income in this case was her testimony that she eared $280 per week during the relevant period, that her rent was $180 per week, that her power bill was $200 per month, and that she incurred gasoline expenses where she worked 20 miles from her home. She asserts that her failure to support was not willful where she did not have the financial means to support the children and where

the trial court did not adjudicate a support obligation amount.

Father also asserts that the record contains no order of support other than the trial court's order of November 9, 2010. Father further asserts that the trial court's November 9 order set his child support obligation at $25 per week, beginning the first day of the month after entry of the order, and that his first child support payment accordingly was due on December 1, 2010. He additionally asserts that he was hospitalized in July 2010, and that during the remainder of the relevant four month period prior he was in the Spring 2 Life residential drug rehabilitation program as recommended by the alcohol and drug assessment and required by the permanency plan. He asserts that any income he earned while in the rehabilitation program was retained by the facility to pay fees, and at the trial of the matter testified that the Spring 2 Life program allows for gradual control of a patient's income.

Upon review of the record, we note that the trial court's adjudicatory order referenced by Mother in her brief was entered on November 9, 2010, nun pro tunc to June 16, 2010, and that it was entered following a June 15-16, 2010, hearing on DCS's petition for a finding of dependency and neglect. As Mother asserts, the trial court reserved the matter of Mother's child support obligation. The trial court transferred the matter to the Rutherford County Child Support Office to seek support from Mother. The trial court further transferred any issues of child support arrearages to the Child Support Office. As Father asserts, the trial court ordered Father to pay child support on behalf of Isobel in the amount of $25 per week beginning the first day after entry of the order. The trial court also provided, however, that Father should maintain and preserve funds owing to his child, and that payments would be made through the Central Child Support Receipting Unit. The trial court advised that the directions and address for payment were attached to the order. We additionally note that the matter of child support appears to have been reserved by the trial court throughout the pendency of this matter. The trial court's order granting Mother a trial home pass in January 2011 does not reference child support and reserves "[a]ll other matters." The court's orders extending the trial home pass recite alternately that Mother's child support is reserved or that it remains the same as prior orders. It appears that the trial court did not enter an order of support until November 9, 2010, after DCS filed the petition to terminate parental rights. As noted above, that order set Father's child support obligation at $25 per week and reserved the matter of Mother's child support obligation.

In its brief, DCS asserts the trial court's finding that Mother and Father willfully failed to pay child support is supported by clear and convincing evidence. It argues that, for the four months prior to the November 2010 petition to terminate parental rights, neither Mother nor Father provided any financial support although they were not incapacitated, not in residential treatment facilities, and were employed for "some of that time period." DCS also states that Father was admitted to Vanderbilt Hospital and treated for burns in July 2010, that

he left the hospital on or about August 1, and that he entered a residential drug treatment facility, Spring 2 Life after leaving the hospital. DCS asserted that "[a]fter reaching a certain level in the program, the Spring 2 Life program transports patients to and from work, for a fee." It asserts that Father participated in a work release program while at Spring 2 Life, and that in September 2010 Father began a part-time job earning $90 per week. DCS further states that the Spring 2 Life program charged $150 per week. DCS asserts that Father had "numerous short lived attempts at employment thereafter, but failed to pay one cent of child support." DCS states in its brief that Father completed the Spring 2 Life program on January 30, 2011; that he was arrested on Meth charges in June 2011; and that he remained incarcerated throughout the trial of the matter. DCS further states, "At no time subsequent to the January 2010 removal of his child does the record reveal that Father secured steady legal employment," although he "claims to have assisted Mother with payment of rent from some unidentified income source." The only proof of Mother's income referenced by DCS in its brief is the trial testimony of Melanie Patterson (Ms. Patterson), the DCS family service worker who was assigned to this matter. We note that Ms. Patterson testified at trial that, during the four months preceding the November 2010 petition to terminate parental rights, Mother was earning $8 per hour working 40 hours per week with a temp agency.

We also note that Mother testified at trial that she separated from Father in July 2010 and that she started working in mid-July 2010. She further testified that she worked until the first or middle part of November, that she worked 40 hours per week, and that she earned $8 per hour. She testified that her take-home pay was $298 per week. She testified that her rent was $180 per week, and that her electric bill was $200 per month, and that she incurred transportation expenses to travel to work. Mother testified that she received no financial assistance from Father, who was participating in the Spring 2 Life Program, and that she did not recall receiving food stamps.

As we have noted, DCS had the heavy burden to produce clear and convincing evidence that Mother and Father had the ability to support the children and that they willfully failed to do so. *In re M.J.B.*, 140 S.W.3d 643, 655 (Tenn. Ct. App. 2004). DCS points us to no evidence in the record to support a finding, by clear and convincing evidence, that Mother or Father were financially able to support the children but willfully failed to do so. Additionally, the trial court made no findings with respect to Mother's income during the relevant period or with respect to her earning capacity other than finding that she is able-bodied and capable of working. Mother's testimony with respect to her income and expenses is not refuted and is supported by Ms. Patterson testimony. Similarly, the trial court's findings with respect to Father's ability to support Isobel are somewhat contradictory. The trial court found Father's testimony that he did not have the ability to pay child support to be "not credible." However, the trial court further found that, even if it were to find that Father did not have control of his earnings while in the Spring 2 Life program, it nevertheless was

his "responsibility to see that those earnings were sent for the benefit of his child" regardless of the fees charged by Spring 2 Life. It is undisputed, however, that Spring 2 Life retained Father's income in support of fees, and that participation in drug rehabilitation was required by the permanency plan.

Upon review of the record in this matter, we find that DCS simply failed to carry its burden to demonstrate, by clear and convincing evidence, that Mother or Father willfully failed to financially support the children for the four consecutive months prior to the filing of the petition to terminate parental rights on November 2, 2010. Thus we reverse the trial court's finding of abandonment for failure to support.

### *Abandonment for Failure to Provide a Suitable Home*

We next turn to the trial court's termination of parental rights based on abandonment for the failure to provide a suitable home. Under the Tennessee Code, abandonment for the failure to provide a suitable home occurs when

> The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii)(2010). There is no dispute in this case that the circumstances present at the time the children were removed from Parents' care prevented DCS from taking reasonable efforts to avoid removal. The time period relevant to our

analysis of this issue is January 25, 2010 through April 25, 2010 .

As noted above, Parents were incarcerated in January 2010 and were released from incarceration on February 14, 2010. It is undisputed that neither Mother nor Father were employed when they were released, and that they had almost no money. For the next several months, Parents were unable to provide for their own housing, moving among friends and relatives until moving into a trailer in June. At some point before moving into the trailer, Parents apparently located an efficiency apartment, which DCS determined was not suitable for the children where the apartment had no bedrooms. Parents separated in June and Mother moved in with her mother. Father remained in the trailer, which burned down shortly thereafter, allegedly as a result of Father's attempt to manufacture meth. There is nothing in the record to suggest that either Mother or Father provided a suitable home for the children from January through April 2010. We accordingly turn to whether DCS made reasonable efforts to assist Parents and whether Parents "made no reasonable efforts to provide a suitable home and . . . demonstrated a lack of concern for the child[ren] to such a degree that it appears unlikely that they [would] be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(2010).

In its brief, DCS asserts it provided assistance to Parents "regarding housing, by providing lists and resources to the couple and by making contacts with drug, alcohol and mental health facilities." The only specific assistance referenced by DCS with respect to housing, however, is a "list of services available in Dickson, which resulted in the location of an efficiency apartment." DCS asserts that it determined the efficiency apartment was not sufficient to house the children, however, because it had no bedrooms. It submits that a case-worker provided Parents with an additional list of housing services and provided Parents with her contact information. Parents apparently obtained housing in Shelbyville without DCS assistance. "Reasonable efforts," however, requires DCS to do more than simply provide a parent with a list of services. *E.g., State, Dep't. of Childrens Servs. v. Estes*, 284 S.W.3d 790, 800-801 (Tenn. Ct. App. 2008). Although its efforts do not need to be "Herculean," DCS is required to use its "'superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not.'" *Id*. at 801 (quoting *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004) (citing *In re D.D.V.*, No. M2001–02282–COA–R3–JV, 2002 WL 225891, at *8 (Tenn. Ct. App. Feb.14, 2002))). DCS does not bear the sole responsibility, of course. Parents also must make reasonable efforts towards achieving the goals established by the permanency plan to remedy the conditions leading to the removal of their children. *Id*. (citations omitted). The burden is on the State to prove by clear and convincing efforts that its efforts were reasonable under the circumstances. *Id*.

In this case, DCS points us to no evidence in the record to demonstrate that it did anything other than provide Parents with a list of possible housing options. Parents, moreover, assert that when they found an efficiency apartment that they presumably could afford, DCS stated that it was not suitable because it did not have separate bedrooms. DCS has simply failed to carry its burden to demonstrate that it made reasonable efforts to assist Parents with housing during the relevant statutory period, or that Parents made no reasonable efforts to obtain suitable housing. We accordingly reverse parental termination based on the ground of abandonment for failure to provide suitable housing where it is not supported by clear and convincing evidence.

### *Persistence of Condition and Substantial Noncompliance with Permanency Plan*

We turn first to termination of Father's parental rights based on substantial noncompliance with the permanency plan as set forth in Tennessee Code Annotated § 36-1-113(g)(2) and persistence of conditions as defined by section 36-1-113(g)(3). Persistence of conditions requires the trial court to find, by clear and convincing evidence, that

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tennessee Code Annotated § 36-1-113(g)(3)(2010 & Supp. 2012).

Father acknowledges in his brief that he failed to comply with the permanency plan "in a number of respects." As Father notes, the children came into DCS custody as a result of Parents' drug abuse and on suspicion that meth was being manufactured in the home. Father concedes that he failed to cease illegal drug use and "activity" even after completing the Spring 2 Life rehabilitation program. He further concedes that he is currently incarcerated, that there is little likelihood that he will be released from incarceration at an early date, and that he is unable to care for the children. Father concedes that he ceased communication with DCS in March 2011. Father also acknowledges that the conditions

which led to the removal of the children persist where the children were removed from the home when he was charged with the manufacture of methamphetamine, and where he currently is incarcerated as result of a subsequent charge of manufacture of meth. Father additionally acknowledges that his conduct supports the trial court's determination that termination is in the best interests of the children. Father's brief is largely dedicated to asserting that the trial court erred by terminating Mother's parental rights on these grounds. We affirm termination of Father's parental rights based on persistence of conditions and substantial noncompliance with the permanency plan.

We turn next to the termination of Mother's parental rights based on noncompliance with the permanency plan and persistence of conditions. We discuss the two grounds together because, as Mother asserts, her abuse of illegal drugs permeates this case. Mother contends that the trial court's order granting her a trial home pass that lasted more than six months demonstrates that she made substantial progress and was in compliance with the permanency plan. She asserts that the home pass was revoked only because she failed a hair follicle drug screen based on a sample taken on July 1 that covered a period dating from April 2, 2011. She further asserts that she did not receive intensive personal drug counseling until after April 2, 2011, and that the evidence was undisputed that she remained drug-free while in one-on-one counseling. Mother contends that she substantially completed the tasks required in the permanency plan where she participated in drug and alcohol assessment, random drug screens, engaged in mental health counseling, attended narcotics anonymous meetings, provided DCS with relevant release forms, attended parenting classes, and provided a budget and leases. She further asserts that, although she moved several times, DCS never found her homes to be unsuitable. Mother submits that the DCS case worker acknowledged that Mother demonstrated appropriate parenting skills, and that she visited with the children and that the visits went well. She acknowledges, however, that she failed to remain drug-free.

Mother also asserts that DCS failed to make reasonable efforts to assist her. She submits that the children were removed from her care because of her drug addiction, and acknowledges that she "vacillated between clean and dirty drug screens over the next year." She contends that the only actions taken by DCS to assist her to overcome her addiction was to send her to alcohol and drug assessment and provide drug screens. She asserts that the only effort made by DCS to help her overcome her addiction was to provide counseling by "Ms. Biggers." Mother submits that one-on-one counseling by Ms. Biggers was successful, but that it was "too little too late because she failed a hair follicle screen that covered a period before her treatment."

Mother also contends that the emphasis placed by DCS on her need to maintain stable employment over treatment to maintain sobriety "were not a close fit with the reason for

removal" of the children. She relies on *In re R.L.F.*, 278 S.W.3d 305 (Tenn. Ct. App. 2008), to support her assertion that DCS failed to make reasonable efforts to assist her to address the reason for removal of the children from her care, and that this failure mandates reversal in this case. She contends that DCS was "completely passive" with respect to assisting her to overcome her drug addiction until April 2011. She asserts that DCS provided her with a list of Narcotics Anonymous meetings and told her to attend some classes, but otherwise expected her to initiate and conduct remedial efforts herself. Mother contends that DCS efforts primarily consisted of affirming her drug addiction while doing little to help her to overcome it.

DCS, on the other hand, asserts that Mother did not participate in all recommended services, that she failed to maintain sobriety and did not "demonstrate the skills to maintain sobriety." DCS also asserts that Mother was incarcerated during the trial home pass without disclosing the charges or the incarceration to DCS. DCS asserts that Mother failed to reveal that she had lost employment, that Mother remains unemployed, and that she is without a home or leased premises. DCS further asserts that Mother tested positive for meth at least twice after the petition to terminate her parental rights was filed, and that she ceased drug counseling programs. It contends that it made all reasonable efforts to assist Mother under the circumstances, and "went above and beyond its responsibility to provide an in-home trial . . . and in-home drug counseling with Ms. Biggers when it appeared to [the case worker] that drug problems might be developing."

Mother undisputedly tested positive for illegal drugs when the children were taken into State custody in January 2010, and her drug screens undisputedly vacillated between positive and negative results. However, DCS does not specify any efforts undertaken to assist Mother to overcome her drug addiction other than providing screenings, a list of resources, and finally counseling with Ms. Biggers in April 2011. DCS does not address Mother's contention that it emphasized employment over sobriety, but submits that the conditions leading to the removal of the children persist where Mother continues to use illegal drugs and is unemployed and without a stable home.

In its January 2011 order granting Mother increased visitation, the trial court found "that Mother has made significant progress towards the objectives in the permanency plan[.]" Further, as Mother asserts, the progress reports contained in the record indicate that Mother was making "good" progress towards achieving the goals established in the permanency plan, and that her visits with the children went well. In January 2011, the trial court was sufficiently satisfied with Mother's progress that it allowed Mother a trial home pass. In its order granting the pass, the trial court noted that Mother was employed in a night shift capacity and permitted Father's mother to care for the children while Mother was at work. In a review order filed on April 6, 2011, the trial court found that a hair follicle test revealed

-14-

Mother had used methamphetamine approximately 90 days on or before March 2011. The trial home pass nevertheless was extended an additional 90 days. Mother passed a drug screen on May 11, 2011. On June 17, 2011, the trial court found that Mother had passed a drug screen and that she was "doing well" and in drug counseling. The trial court again extended the home trial. Following a hearing on July 12, the trial court found that Mother again had failed to pass a hair follicle test on July 1, 2011, and revoked the home pass.

In her brief, Mother asserts that the July 2011 hair follicle test should not have been admitted into evidence, but does not raise this as an issue for review. Further, although Mother questioned the manager of the drug testing company regarding the test at the trial of this matter, it does not appear from the record that Mother objected to admission of the test into evidence, and no motion to alter or amend the judgment was filed in this case. Mother asserts that the test was based on a sample provided by Mother on July 1 that covered a period dating to April 2, 2011, and that she did not receive intensive drug counseling until after April 2. We note that the testimony at trial was that the relevant time frame reflected by the test was zero to 90 days.

At the trial of this matter, Mother testified that she had several temporary jobs and had to move frequently as a result of her changing income. She also testified that she was arrested for driving on an expired license the day after the children were returned to State custody when the home pass was revoked. More significantly, Mother testified that she was arrested for the sale of a schedule 4 drug on April 26, 2011, during the trial home pass. Mother testified that she pled guilty to the reduced charge of simple possession in April 2011, and received probation for 11 months and 29 days. She testified that she was ordered to serve ten days on five consecutive weekends beginning May 20, 2011, and that the children stayed with Father's mother during those weekends. Mother testified, however, that the 2011 arrest arose from charges incurred in March 2009, and that she was not arrested on those charges until February 2011. She further testified that she did not advise DCS, her case worker, the guardian ad litem, or the court of the April 2011 arrest. Mother testified that she lost her employment and changed housing during the trial home pass, and that she currently was not employed and did not have her own housing.

Mother testified that she had been drug-free since January 2011 and that, notwithstanding the positive hair follicle test in July, she had not used drugs since the day before the home trial pass began. She testified that she was not currently using drugs. She testified that she was currently living with her mother and was not employed, and acknowledged that it was "[her] own" fault that the trial home pass ended. Mother also testified that she previously believed that she did not need in-patient drug treatment, although she now felt that she would have benefitted from in-patient treatment. She testified that she attended the Tony Rice program, but went to only five or six of the 12 scheduled classes.

She testified that she stopped attending because of her work schedule, but acknowledged that she did not return to the program after she stopped working and that she did not inform DCS that she had stopped attending the program. She testified that no one from DCS had indicated that securing employment was more important than attending drug classes, but "that's where [she] was coming from." Mother testified that she attended a drug counseling program at her church sporadically. Mother also testified that DCS provided her with drug counseling, and that she also sought out counseling on her own. She testified that when she failed the hair follicle test in March 2011, DCS placed Ms. Biggers in her home to provide one-on-one counseling.

Mother testified that she had not visited her children since the trial home pass had ended, despite two scheduled visits. She testified that she was involved in a car accident the day the first visit was scheduled, and that she missed the second visit as a result of a schedule misunderstanding. Mother also testified that she understood that if she did not complete the goals listed in the permanency plans that adoption was an option for her children.

As noted above, Mother's use of illegal drugs caused the children to be removed from her care. Further, fundamental elements of the parenting plan in this case required Mother to cease her abuse of illegal drugs, to secure employment, and to provide suitable housing. Mother's own testimony reveals that she was not able to secure employment or to provide stable housing. Mother's testimony with respect to her drug use is contradicted by the July 2011 hair follicle test. Mother's testimony also supports DCS's contention that Mother was incarcerated during the trial home pass, and that she failed to advise DCS of her situation.

In sum, Mother remained without stable housing and unemployed for much of the time between removal of the children from her care in January 2010 and the time the matter was heard in August to October 2011. She additionally failed to remain drug-free, failed to communicate her decision to stop attending drug counseling to DCS, was unwilling to enter in-patient rehabilitation, and failed drug tests during the trial home pass despite counseling with Ms. Biggers. Upon review of the record, we are satisfied that DCS made reasonable efforts to assist Mother with her drug addiction under the totality of the circumstances. Clear and convincing evidence supports termination of Mother's parental rights on the grounds of substantial noncompliance with the permanency plan and persistence of conditions, and that termination of Mother's parental rights is in the best interests of the children.

### *Best Interests*

We turn finally to whether the trial court's determination that termination of parental rights is in the children's best interests. As noted above, Father concedes that termination of his parental rights is in the bests interests of the children. Upon review of the record, we

agree with the trial court that termination of Mother's parental rights also is in the children's best interests.

Tennessee Code Annotated § 36–1–113(i) provides a non-exhaustive list of factors for the trial court to consider when determining whether termination of parental rights is in the best interests of the children. This section provides:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(2010)[2].

Except for a brief trial home pass, which was revoked after Mother tested positive for illegal drugs, Isobel and Bree'ana have been in foster care continuously since January 2010, when they were three years of age and eight months of age, respectively. As noted above, the evidence contained in the record supports the trial court's finding that Mother continues to abuse illegal drugs, including methamphetamine; that she is unemployed and unable to financially support the children; and that she is unable to provide a safe and stable home for the children. Mother has failed to make adjustments to her circumstances or conduct such that it would be safe to return the children to her care. Clear and convincing evidence supports the trial court's determination that termination of parental rights to make the children available for adoption is in the children's best interests in this case.

### *Holding*

In light of the foregoing, we reverse termination of Mother's and Father's parental rights on the grounds of abandonment for failure to support and failure to provide a suitable home. We affirm termination of parental rights on the grounds of substantial noncompliance with the permanency plan and persistence of conditions. We also affirm the trial court's judgment that termination of parental rights is in the best interests of the children. This matter is remanded to the trial court for enforcement of the judgment and the collection of costs. Costs of this appeal are taxed one-half to Mother and one-half to Father.

_____
DAVID R. FARMER, JUDGE

---

[2]Tennessee Code Annotated § 36-1-113(i)(7) currently provides:

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner[.]